FILED
United States Court of Appeals
Tenth Circuit

March 9, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RIVALDO ALEJANDRO BELTRAN
ESCAMILLA,

      Petitioner,

v.

ERIC H. HOLDER, JR., United States
Attorney General,

      Respondent.

No. 11-9510

(Petition for Review of a Final Order of
the Board of Immigration Appeals)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE,** Chief Judge, **EBEL** and **LUCERO**, Circuit Judges.

Rivaldo Alejandro Beltran Escamilla (Escamilla) seeks review of a Board of

Immigration Appeals (BIA) decision denying his applications for asylum, withholding of

removal, and protection under the United Nations Convention Against Torture (CAT).

We have jurisdiction for limited review under the Immigration and Nationality Act (INA)

§ 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D), and we deny Escamilla's petition for review.

For asylum and withholding purposes, Escamilla argued he is a member of four

particular social groups: 1) Salvadoran men believed to be gang members of a rival gang;

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

2) Salvadoran men with prior gang associations who have resisted gang membership and bettered their lives; 3) Salvadoran men who are family members of well-known, high-ranking gang members; and 4) Salvadoran men who are HIV positive. On appeal, Escamilla acknowledged at oral argument that our intervening ruling in Rivera Barrientos v. Holder forecloses the second proposed social group. 658 F.3d 1222, 1234 (10th Cir. 2011) (holding that the group defined as "Salvadoran women between the ages of 12 and 25 who have resisted gang recruitment" lacked sufficient social visibility to be a particular social group). Escamilla also seeks review of the BIA's denial of his applications for asylum and withholding of removal based on his claims of past and future persecution due to his political opinion.

In this case, we conclude that Escamilla's first proposed social group, Salvadoran men believed to be gang members of a rival gang, fails for lack of visibility. We then assume, without deciding, that Salvadoran men who are family members of well-known, high-ranking gang members and Salvadoran men who are HIV positive qualify as particular social groups, but hold that Escamilla cannot claim asylum or withholding from removal based on his membership in these groups because he fails to show that membership in either group resulted in his past persecution or in his well founded fear of future persecution. We next determine that he has not been subjected to persecution based on his political opinion and that he does not have a well founded fear of future persecution based on his political opinion, again denying him asylum and withholding-from-removal eligibility. Finally, because he cannot show that it is more likely than not

2

that he would be tortured if removed to El Salvador, we determine that Escamilla is ineligible for protection under the CAT.

## I.

### A. Escamilla's background

Escamilla presents detailed information on the tragic gang violence in El Salvador, the government's effort to combat the gang violence, the status of HIV-positive men in El Salvador, and his own personal background.[1] Although Escamilla is not and has never been a gang member, his life in El Salvador intertwines with the two prominent Salvadoran gangs, Mara Salvatrucha ("MS-13") and the 18th Street gang ("Mara 18" or "M-18"). The Salvadoran government has made reducing the power and influence of gangs a high priority, with very limited success. Gang recruitment focuses on young men, often as young as nine or ten. While most gang membership is not coerced, gangs are recruiting with increasingly violent methods, including harassment, physical abuse, and murder, either of the targeted youth or his or her family. See, e.g., Barrientos, 658 F.3d at 1225–26 (woman kidnapped, gang-raped, and beaten, and her family threatened with murder when she refused to join MS-13). Gangs significantly affect most of the Salvadoran population.

Escamilla faced gang violence beginning at age nine, when MS-13 members beat

---

[1] Escamilla's opening brief refers to additional factual information contained in an Affidavit from Professor Thomas M. Davies, Jr. This court cannot consider the additional information in this affidavit. Pursuant to Immigration and Nationality Act (INA) 242 (b)(4)(A), 8 U.S.C. § 1252(b)(4)(A) (2011), "the court of appeals shall decide the petition only on the administrative record on which the order of removal is based."

him because he refused to join. Beginning at age nine or ten, he lived on the streets for three years, where he was often recruited and beaten by both MS-13 and M-18. While living on the street, he was shot twice by people wearing police uniforms, although Escamilla was not sure if they were actually police or merely gang members in police uniforms. Escamilla suggests that many of his problems with gangs stem from his uncle's extensive involvement in M-18. His uncle is currently serving a jail sentence for "murder, extortion, and forced recruitment of young men into the ranks of the Mara 18 gang." Certified Administrative Record (CAR) at 568. While living on the street, Escamilla faced pressure from both gangs. As he put it, "[t]o the outside world, and the rival Mara Salvatrucha 13 gang, it appeared I was a Mara 18 gang member. Yet to the Mara 18 gang, I was the kid that constantly refused to join their ranks. I was becoming dangerously stuck in the middle." Id. at 569.

As a young adult, Escamilla was beaten, robbed, and threatened with death by MS-13 during an attack when returning from work, and he often faced "[h]ard looks and threats" from MS-13. Id. at 572. At the time, he was also dating a woman who was part of the Mara 18 gang, resulting in additional attacks by MS-13. MS-13 later killed his girlfriend and mutilated her body.

Later, Escamilla worked in a coffee field, and while working there he inadvertently disrupted an MS-13 plan to rape a woman. MS-13 members sought to kill Escamilla after the foiled rape, but because Escamilla was not working on the day they came for him, they ultimately killed another man in the coffee fields. M-18 also attacked Escamilla

4

several times: he was carjacked by M-18 members, including one wearing a police badge, chased by an M-18 member carrying a machete, and finally shot at by M-18 members.

After the last shooting attempt, Escamilla left El Salvador. He traveled up through Central America, eventually entering the United States in 2006. He later moved to Jackson, Wyoming, where he began living with Rhea Brough, a United States citizen, in March 2007. He was diagnosed with HIV in July 2007. His condition does not yet require medication, but he does receive medical checkups with blood tests to monitor his condition every three or four months. Escamilla married Brough on April 25, 2009.

In addition to the evidence related to Salvadoran gang activity, Escamilla presented testimony from an expert witness, Mr. Omar Banos, who described conditions in El Salvador that might impact an HIV-positive man. Banos described societal discrimination, stigma, and occasional violence inflicted on HIV-positive men, and noted that an HIV-positive man would likely be considered homosexual, which would expose him to additional discrimination. He also noted that El Salvador has laws prohibiting discrimination against HIV-positive individuals, although the laws do not appear to be widely enforced. Banos discussed access to HIV medications in El Salvador, noting that although the government had an all-access policy for anyone needing HIV drugs, only roughly half of people needing the drugs actually received them.

### B. Immigration court proceedings

The United States Department of Homeland Security initiated removal proceedings against Escamilla by issuing him a Notice to Appear in March 2007.

Escamilla admitted deportability for entering the United States illegally, without inspection, admission, or parole, and an immigration judge (IJ) found him removable. Seeking to avoid deportation to El Salvador, Escamilla applied for asylum, withholding of removal,[2] and protection under the CAT.[3]  In his application for asylum and withholding of removal, Escamilla claimed membership in four particular social groups:

> 1) Salvadoran men believed to be gang members of a rival gang;

> 2) Salvadoran men with prior gang associations who have resisted gang membership and bettered their lives;

> 3) Salvadoran men who are family members of well-known, high-ranking gang members; and

> 4) Salvadoran men who are HIV positive.

He also claimed refugee status based on past persecution and a well founded fear of future persecution due to his political opinion.  Finally, Escamilla sought to avoid deportation by seeking protection under the CAT, which does not require membership in a particular social group.

---

[2]  Congress changed the INA to refer to "restriction on removal," 8 U.S.C. § 1231(b)(3) (2011), but corresponding regulations retain the "withholding of removal" language.  8 C.F.R. § 208.16(b) (2011).  For consistency, we continue to use "withholding of removal."  See Uanreroro v. Gonzales, 443 F.3d 1197, 1200 (10th Cir. 2006).

[3] Formally, the CAT is the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.  Congress implemented the CAT under the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998).  The CAT is administered through regulations at 8 C.F.R. § 208.16–18 (2011).

The IJ relied on BIA precedent in Matter of S-E-G-, 24 I. & N. Dec. 579 (BIA 2008), and Matter of E-A-G-, 24 I. & N. Dec. 591 (BIA 2008), to determine that the first three social groups identified by Escamilla lacked sufficient particularity and social visibility to serve as particular social groups for asylum or withholding of removal purposes. The IJ concluded that the fourth social group identified by Escamilla, Salvadoran men who are HIV positive, can constitute a particular social group for immigration purposes. But, the IJ went on to conclude that there was no reasonable possibility that Escamilla would be harmed due to his membership in this group if he were forced to return to El Salvador, thereby foreclosing the possibility of asylum for Escamilla based on his membership in any of the social groups he listed. The IJ also concluded that it was not more likely than not that he would be harmed due to his membership in the group of HIV positive males if he were forced to return to El Salvador. As a result, Escamilla was ineligible for withholding of removal based on membership in a particular social group.

The IJ also rejected Escamilla's application for asylum or withholding of removal based on persecution due to Escamilla's political opinion. The IJ relied on Matter of S-E-G- and Matter of E-A-G- (both citing INS v. Elias-Zacarias, 502 U.S. 478, 482 (1992)) for the proposition that gangs generally target individuals for recruitment to fill their ranks, and not based on the individual's belief or opinion, even if that opinion is in opposition to the gang. The IJ concluded that, because Escamilla was not targeted for his beliefs, Escamilla could not claim asylum or withholding of removal based on his anti-

7

gang views.

Finally, the IJ rejected Escamilla's reliance on CAT to avoid deportation, finding that Escamilla's evidence did not show the Salvadoran government had the specific intent to inflict torture.

Escamilla timely appealed the decision to the BIA.

### C. BIA proceedings

The BIA agreed in large part with the IJ. The BIA held that "[t]he proposed groups of Salvadoran young men are individually and collectively too broad and ill-defined to constitute a discrete particular social group within the meaning of the Act, and that they are not identifiable groups generally recognized by others in the community." CAR at 4. The BIA did not address the IJ's determination that HIV-positive men could be a particular social group, but rather agreed with the IJ's determination that "respondent did not establish that he has a well founded fear or that there is a pattern and practice of persecution of HIV-positive men in El Salvador." Id. at 4. Finally, the BIA rejected Escamilla's contention that he faced persecution on the basis of his political opinion. Thus, the BIA followed the reasoning of the IJ and denied Escamilla's application for both asylum and withholding of removal.

Finally, the BIA denied Escamilla's CAT application on the ground that "[t]he respondent did not establish that the Salvadoran government would torture or acquiesce to the torture of the respondent for any reason," and that "respondent did not suffer any past torture during his encounters with gangs." Id. at 3–4.

8

Escamilla timely petitioned this court for review of the BIA decision.

## II.

On appeal, Escamilla continues to assert eligibility for asylum and withholding of removal based on eligibility in three social groups,[4] coupled with past and a well founded fear of future persecution on account of his membership in these groups. He also maintains his eligibility for asylum and withholding of removal based on persecution stemming from his political opinion. Finally, he continues to argue that he is eligible for protection under the CAT.

### A. Standard and scope of review

We have jurisdiction for limited review under INA § 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D), which provides for our "review of constitutional claims or questions of law" in immigration decisions. We review de novo questions of law, Lockett v. INS, 245 F.3d 1126, 1128 (10th Cir. 2001), with "deference to the BIA's legal determinations unless they are clearly contrary to the statute's language or to congressional intent." Rivera-Jimenez v. INS, 214 F.3d 1213, 1216 (10th Cir. 2000) (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 445–48 (1987)).

Our factual review is deferential—we must look to the record for "substantial evidence" that supports the agency's decision. "[O]ur duty is to guarantee that factual

---

[4] Initially, Escamilla continued to argue that he was a member of four particular social groups, but, as noted, his counsel acknowledged at oral argument that our intervening ruling in Barrientos forecloses the second proposed social group. 658 F.3d at 1234.

determinations are supported by reasonable, substantial and probative evidence considering the record as a whole." Elzour v. Ashcroft, 378 F.3d 1143, 1150 (10th Cir. 2004). "The BIA's findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." Hang Kannha Yuk v. Ashcroft, 355 F.3d 1222, 1233 (10th Cir. 2004) (quotation omitted).

Our scope of review of BIA decisions varies based on the type of decision entered. Uanreroro v. Gonzales, 443 F.3d 1197, 1203–04 (10th Cir. 2006). As in this case, a single BIA member may decide the merits of the appeal and issue "a brief order, affirming, modifying or remanding" the IJ decision, under 8 C.F.R. § 1003.1(e)(5) (2011). This brief order is an independent BIA decision constituting a final order of removal under 8 U.S.C. § 1252(a), Schroeck v. Gonzales, 429 F.3d 947, 951 (10th Cir. 2005), and "we will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." Uanreroro, 443 F.3d at 1204 (citations omitted). In "seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." Id. (citing 67 Fed. Reg. 54,886 n.6). "As long as the BIA decision contains a discernible substantive discussion, however, our review extends no further, unless it explicitly incorporates or references an expanded version of the same reasoning below." Id.

### B. The statutory framework

#### 1. Asylum

Escamilla applied for asylum, withholding of removal, and protection under the

10

CAT. To be eligible for asylum, an individual must demonstrate that he is a refugee under INA § 101(a)(42), 8 U.S.C. § 1101(a)(42). 8 U.S.C. § 1158(b)(1)(A) ("[T]he Attorney General may grant asylum to an alien . . . if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."). "Refugee" means a person outside of his or her country of nationality

> who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42). Thus, to be a refugee, Escamilla must show that he has suffered persecution or has a well founded fear of persecution, where that persecution is based on his membership in a particular social group or on his political opinion. Id.

### a. Particular social group

"What constitutes a particular social group is a pure question of law that we review de novo." Cruz-Funez v. Gonzales, 406 F.3d 1187, 1191 (10th Cir. 2005). Defining a particular social group is difficult, and the concept has "evolving boundaries." Barrientos, 658 F.3d at 1228. Matter of Acosta established the BIA's initial definition of a particular social group: "a group of persons all of whom share a common, immutable characteristic." 19 I. & N. Dec. 211, 233 (BIA 1985). The characteristic might be "sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership," but the common characteristic "must be

11

one that the members of the group either cannot change or should not be required to change because it is fundamental to their individual identities or consciences." Id. The BIA has recently added to this definition and now requires "particularity" and "social visibility," which we approved in Barrientos. 658 F.3d at 1228 (citing Matter of C-A-, 23 I. & N. Dec. 951, 957 (BIA 2006)); see also id. at 1231, 1234 ("We . . . defer to the BIA's formulation of 'particular social group' as requiring the group be defined with particularity. . . . We . . . join those circuits that have accepted the BIA's social visibility test in interpreting the statute.").

i. Particular social group - particularity

The particularity element of particular social group requires that the proposed group "have particular and well-defined boundaries." Matter of S-E-G-, 24 I. & N. Dec. at 582. "The essence of the 'particularity' requirement, therefore, is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." Id. at 584. The BIA has rejected groups defined by terms such as "affluence" or "wealth" as too subjective to meet the particularity requirement. Matter of A-M-E- & J-G-U-, 24 I. & N. Dec. 69, 76 (BIA 2007). However, in Barrientos, we overturned a BIA decision that rejected the trait of having resisted gang recruitment as insufficiently particularized. 658 F.3d at 1231. We held that "the specific trait of having resisted recruitment is not so vague. . . . [H]aving resisted gang recruitment can be a particularly defined trait." Id. Because that trait, as well as gender traits and age traits, are "susceptible to easy

12

definition," we determined that the class of "Salvadoran women between the ages of 12 and 25 who have resisted gang recruitment" did not fail for lack of particularity. Id. Barrientos remains the only Tenth Circuit case defining particularity, but it indicates that social groups with clearly definable limiting traits can generally achieve particularity.

ii. Particular social group - social visibility

The social visibility element requires that "society perceive those with the characteristic in question as members of a social group." Matter of C-A-, 23 I. & N. Dec. at 957. "Whether a proposed group has a shared characteristic with the requisite 'social visibility' must be considered in the context of the country of concern and the persecution feared." Matter of A-M-E- & J-G-U-, 24 I. & N. Dec. at 74; see also Barrientos, 658 F.3d at 1231–32.

The BIA applies two requirements to the social visibility element. "The first is that citizens of the applicant's country would consider individuals with the pertinent trait to constitute a distinct social group." Barrientos, 658 F.3d at 1232 (citing Matter of C-A-, 23 I. & N. Dec. at 957). For example, the BIA rejected proposed social groups consisting of noncriminal informants working against the Cali drug cartel and Salvadoran youth (or family members of Salvadoran youth) who are recruited by gangs but refuse to join because the BIA determined that neither group would be considered a cohesive group in the applicant's home country. Matter of S-E-G-, 24 I. & N. Dec. at 586. In Barrientos, we determined that the class defined as "Salvadoran women between the ages of 12 and 25 who have resisted gang recruitment" lacked sufficient social visibility to be a

13

particular social group, because the petitioner "offered no evidence to suggest that Salvadoran society considers young women who have resisted gang recruitment to be a distinct social group." 658 F.3d at 1234 (citing Matter of S-E-G-, 24 I. & N. Dec. at 586–87).

The BIA has held that if the proposed social group suffers persecution beyond that experienced by the general public, that persecution can provide evidence that the proposed grouping is considered a social group by society generally. Matter of S-E-G-, 24 I. & N. Dec. at 587. But a social group cannot be "be defined exclusively by the fact that its members have been subjected to harm in the past (i.e., forced gang recruitment and any violence associated with that recruitment)." Id. at 584. In Barrientos, we agreed with the BIA that violence against an individual or proposed group cannot, in and of itself, establish social visibility if the general public suffers the same level of violence. 658 F.3d at 1234–35 (rejecting petitioner's argument that gang violence against her established that the gang perceived her as belonging to a specific group, because the gang directed similar violence against the public at large).

"The second . . . component of social visibility is that the applicant's community is capable of identifying an individual as belonging to the group." Id. at 1232 (citing Matter of S-E-G-, 24 I. & N. Dec. at 586). A particular social group may be recognized in a variety of ways—"[s]ocial groups based on innate characteristics such as sex or family relationship are generally easily recognizable and understood by others to constitute social groups." Matter of C-A-, 23 I. & N. Dec. at 958. The BIA also recognizes other,

less obviously visible groups: Filipinos of mixed Filipino-Chinese ancestry; young women of a particular tribe who were opposed to female genital mutilation; persons listed by the government as having the status of a homosexual; former members of the national police, former military leaders, and land owners. Id. (collecting cases). To determine social visibility, the BIA examines "the extent to which members of the purported group would be recognizable to others in [the applicant's home country]." Id. We have interpreted this requirement such that the "relevant trait [need not] be visually or otherwise easily identified." Id. "Rather, social visibility requires that the relevant trait be potentially identifiable by members of the community, either because it is evident or because the information defining the characteristic is publically accessible." Id. The BIA has noted that groups defined by genital mutilation, kinship ties, and prior employment as a police officer are all sufficiently socially visible to constitute a distinct social group. Id. (citing Matter of C-A-, 23 I. & N. Dec. at 959–60). While the first element of social visibility asks if the group would be considered a legitimate social grouping in the applicant's home country, this second element asks if individuals in the group are capable of being recognized as part of the group by society in the applicant's home country.

### b. Persecution

This court has determined that a petitioner may show a well founded fear of persecution by demonstrating "a reasonable possibility of being persecuted." Uanreroro, 443 F.3d at 1202 ("[S]o long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough

that persecution is a reasonable possibility.") (citing Cardoza-Fonseca, 480 U.S. at 440).

We have established a high bar for the definition of persecution. In Sidabutar, we concluded an Indonesian Christian who was seriously injured and repeatedly beaten by classmates, who was often robbed, and who once had his motorcycle burned by a mob had not been persecuted. Sidabutar v. Gonzales, 503 F.3d 1116, 1124 (10th Cir. 2007). Similarly, we have not found persecution in cases where an alien was robbed and sexually assaulted and suffered a head injury, Tulengkey v. Gonzales, 425 F.3d 1277, 1281 (10th Cir. 2005), or where an alien was "constantly harassed," twice detained for two day stints involving beatings and interrogation, and conscripted into the army, Kapcia v. INS, 944 F.2d 702, 704–05, 708 (10th Cir. 1991). In Vicente-Elias v. Mukasey, we held that "potential job loss, generalized economic disadvantage, and social discrimination," without more, is not persecution. 532 F.3d 1086, 1090–91 (10th Cir. 2008). In contrast, we found persecution for an alien who suffered a severe beating and ten-month imprisonment on account of his political opinion in Nazaraghaie v. INS, 102 F.3d 460, 463–64 (10th Cir. 1996).

Applicants showing persecution must also prove that they were persecuted on account of their membership in a particular social group or other protected class. "The applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(I). We have determined that "one central reason" means "the protected ground cannot play a minor role in the alien's past mistreatment or

16

fears of future mistreatment. That is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." Dallakoti v. Holder, 619 F.3d 1264, 1268 (10th Cir. 2010) (quoting J-B-, 24 I. & N. Dec. 208, 214 (BIA 2007)).

### 2. Withholding of removal and the CAT

Outside of the asylum context, an alien may also seek withholding of removal under 8 U.S.C. § 1231(b)(3) to avoid persecution in their home country. "[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's . . . membership in a particular social group, or political opinion." INA § 241(b)(3), 8 U.S.C. § 1231(b)(3). To establish that his life or freedom would be threatened, "an applicant must establish a clear probability of persecution on account of one of the statutorily protected grounds listed above. . . . A 'clear probability' means the persecution is more likely than not to occur upon return." Uanreroro, 443 F.3d at 1202.

Finally, an alien may, under the CAT, avoid removal by showing "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2).

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

17

8 C.F.R. § 208.18(a)(1) (2011). The torture need not be on account of a protected status. Elzour, 378 F.3d at 1150.

### 3. Standards applicable to relief sought

The legal standards for these three types of relief are related. An alien who cannot establish membership in a particular social group resulting in persecution (either past or feared-future persecution) is ineligible both for asylum and for withholding of removal under 8 U.S.C. § 1231(b)(3). Barrientos, 658 F.3d at 1235 (considering whether a proposed particular social group exists "within the meaning of the INA," which includes both asylum and withholding provisions). For those applicants who are able to establish membership in a particular social group or who seek asylum or withholding of removal on a political opinion basis, if they cannot establish a well founded fear of persecution under asylum standards, their claims will necessarily fail to meet the higher burden of proof required for withholding of removal under 8 U.S.C. § 1231(b)(3) or CAT standards. Elzour, 378 F.3d at 1150.

### C. Escamilla's claim of eligibility for asylum based on his membership in three proposed particular social groups

#### 1. Escamilla's proposed group "Salvadoran men believed to be gang members of a rival gang" fails for lack of visibility.

The IJ relied on the BIA's decision in Matter of S-E-G- to reject this proposed social group. In Matter of S-E-G-, the BIA rejected a social group consisting of "Salvadoran youth who have been subjected to recruitment efforts by MS-13 and who have rejected or resisted membership in the gang based on their own personal, moral, and

18

religious opposition to the gang's values and activities," because it lacked visibility. The BIA first noted that "gangs have directed harm against anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises and territorial power. The respondents are therefore not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests." Matter of S-E-G-, 24 I. & N. Dec. at 579. The BIA determined that, due to the gangs' tendency to attack anyone presenting a threat to their power, "it is difficult to conclude that any "group," as actually perceived by the criminal gangs, is much narrower than the general population of El Salvador. . . . [W]e have no reason to believe . . . that the general societal perception would be otherwise." Id. at 588. The BIA determined that the proposed group, therefore, lacked the social visibility required to be recognized as a particular social group. In this case, the BIA and IJ extended that reasoning to conclude that Salvadoran men believed to be gang members of a rival gang are not in a substantially different situation from anyone else who is perceived to be a threat to the gangs' interests, and thus these men would not be perceived as a group by the general Salvadoran society.

In contrast, Escamilla points to Matter of E-A-G-, 24 I. & N. Dec. 591 (BIA 2008), which considered a social group composed of "young persons who are perceived to be affiliated with gangs." That decision observed that the proposed group does "entail some 'social visibility,'" then rejected the proposed group because of a Ninth Circuit decision that held that an alien's present or past membership in a criminal gang could not

19

constitute membership in a particular social group because the court could not conclude "that Congress, in offering refugee protection for individuals facing potential persecution through social group status, intended to include violent street gangs." Id. at 596 (citing Arteaga v. Mukasey, 511 F.3d 940, 945–46 (9th Cir. 2007)). While recognizing that "the respondent in th[e] case is not, and has never been, a member of any criminal gang," the BIA held that "[n]evertheless, because we agree that membership in a criminal gang cannot constitute a particular social group, the respondent cannot establish particular social group status based on the incorrect perception by others that he is such a gang member." Id.

Escamilla argues this is an "irrational leap," Pet. Br. at 27, and we agree. The concerns expressed by the Ninth Circuit simply are not present for aliens who have never been a part of a gang yet are perceived as gang members. Thus, we reject the BIA's reasoning in Matter of E-A-G- that the group of people perceived to be gang members who are not actually gang members is categorically barred from recognition as a particular social group.

Escamilla argues that he is a member of the group "Salvadoran men believed to be gang members of a rival gang," which differs slightly, but significantly, from the proposed group in Matter of E-A-G-. The "rival gang" language means that Escamilla's proposed grouping is defined not by society's perception of the group, but by the perceptions of the group by gangs who perceive themselves to be "rival gangs." The first prong of the social visibility test requires that citizens of the applicant's country generally

20

would consider individuals with the pertinent trait to constitute a distinct social group, not just that members of opposing groups would consider individuals with the pertinent trait to constitute a distinct social group. Matter of S-E-G-, 24 I. & N. Dec. at 579. The group "Salvadoran men believed to be gang members of a rival gang" is defined by the view of other gangs, not of society at large, and thus fails the first prong of the social visibility test. This proposed social group cannot serve as a particular social group for asylum or withholding of removal purposes.

> *2. Escamilla's membership in two particular social groups did not result in Escamilla's persecution or in Escamilla's well founded fear of future persecution, so he cannot claim refugee status or seek withholding of removal on the basis of his membership in those groups.*

> a. Escamilla's membership in the group of Salvadoran men who are family of well-known, high-ranking gang members did not result in Escamilla's persecution or in Escamilla's well founded fear of future persecution.

Membership in a particular social group alone is not enough. Escamilla must also show that such membership resulted in his persecution or in his well founded fear of future persecution. This requires both a showing of persecution or a well founded fear of future persecution and a showing that such persecution resulted or would result from membership in the social group. "In this circuit, the ultimate determination whether an alien has demonstrated persecution is a question of fact, even if the underlying factual circumstances are not in dispute and the only issue is whether those circumstances qualify as persecution." Vicente-Elias, 532 F.3d at 1091 (citing Nazaraghaie v. INS, 102 F.3d at 463 n.2). This part of the test is very difficult to satisfy for young people from countries like El Salvador, where gang violence seems to touch nearly everyone. In the present

21

case, assuming that Escamilla could show persecution or a well founded fear of future persecution, Escamilla still cannot show that such persecution resulted from his membership in the family of a well-known, high-ranking gang member.

Neither the BIA not the IJ directly addressed whether Escamilla's membership in this group resulted in his persecution or a well founded fear of future persecution, because neither found that the group constituted a particular social group. Even if we were to disagree with the conclusion pertaining to familial membership as membership in a particular social group, we would not remand as a result. In the present case, remand to the BIA would be a mere formality, given that the BIA would remand to the IJ, and the IJ has already considered this issue.[5] Lin v. U.S. Dep't of Justice, 453 F.3d 99, 107 (2d Cir. 2006) ("[R]emand to the BIA is futile . . . whenever the reviewing panel is confident that the agency would reach the same result upon a reconsideration cleansed of errors."). The IJ reviewed the abuse Escamilla suffered at the hands of the gangs, and noted that much of it came before Escamilla's uncle became a high-ranking gang member. He also noted that both MS-13 and M-18 targeted Escamilla for reasons not related to recruitment, but based on general criminal motivations. His conclusion, that "the respondent was not singled out [for gang violence] because of that relationship," CAR at 205, is "supported by reasonable, substantial and probative evidence considering the record as a whole." Elzour, 378 F.3d at 1150. Escamilla's claim for refugee status based on his membership

---

[5] The IJ drew his conclusion in assessing whether this group was a particular social group, not in determining whether Escamilla's membership in the group resulted in his persecution or would result in his well founded fear of future persecution, but that does not vitiate the IJ's finding.

22

in this familial group fails for lack of evidence of persecution or a reasonable fear of persecution based on group membership.

> b.  Escamilla's membership in the group Salvadoran men who are HIV positive did not result in Escamilla's persecution or in Escamilla's well founded fear of future persecution.

Both the BIA and the IJ focused on whether Escamilla could show a well founded fear of future persecution based on his HIV-positive status.  The BIA concluded, "[t]he respondent did not establish that he has a well-founded fear . . . of persecution . . . .  The [IJ] properly concluded that any inadequacies [in] the health care for HIV-positive men in El Salvador cannot be construed as intent by the government to persecute . . . HIV-positive men."  CAR at 4 (citing Ixtlilco-Morales v. Keisler, 507 F.3d 651, 656 (8th Cir. 2007) (holding that alien failed to establish that inadequacies in health care for HIV-positive individuals in Mexico was an attempt to persecute those with HIV)).  The IJ also noted that Escamilla's fiancé (now wife) has testified she would attempt to assist Escamilla with acquiring medication, should it become necessary, further alleviating concerns related to his medical treatment.  The evidence presented does not compel a conclusion that the Salvadoran government does or will persecute HIV-positive men.  Hang Kannha Yuk, 355 F.3d at 1233.

The IJ also discussed potential non-governmental persecution of HIV-positive men in El Salvador, concluding that there was not "a reasonable possibility . . . that he will be harmed if he is required to return to El Salvador."  CAR at 210.  The IJ found that the discrimination and violence against HIV-positive men in El Salvador did not rise to the

23

level required to establish persecution. "The type of fear and discrimination described by the respondent and by the expert witness do not rise to the level of persecution as set forth by the Board of Immigration Appeals and the Tenth Circuit Court of Appeals as defined in particular by Sidabutar v. Gonzales." Id. at 214 (citations omitted). Finally, the IJ concluded, "[t]he behavior complained of in this case is reprehensible certainly, but the Court simply concludes it does not rise to the level of persecution." Id. at 214. We review this determination under the deferential substantial evidence standard, and under that standard we conclude that the evidence in the record does not compel a contrary conclusion. Hang Kannha Yuk, 355 F.3d at 1233.

### D. Escamilla's claim of past persecution and a well founded fear of future persecution based on his political opinion

Escamilla's claim of persecution on the basis of his political opinion also fails. Escamilla claims that he was and will be persecuted on the basis of his political opinion, which he identified as resistance to "gang initiation on general principles and religious grounds." Pet. Br. at 43–44. "Coercive efforts by a gang to recruit new members are not necessarily persecution on account of political opinion." Barrientos, 658 F.3d at 1228. To show persecution on account of political opinion, a gang target subject to coercion would have to show that the gangs "persecute him because of that political opinion, rather than because of his refusal to fight with them." Elias–Zacarias, 502 U.S. at 483; see also Barrientos, 658 F.3d at 1228.

In Barrientos, the record reflected some evidence that the petitioner "was assaulted on account of her vocal opposition to gangs." 658 F.3d at 1228. Despite that evidence,

24

we determined it "equally likely that she was attacked on account of her refusal to join." Id. In the present case, Escamilla has not presented any evidence of his own strong negative opinion of gangs; he dated and associated with gang members, although he refused to join a gang himself. Escamilla claims that he was and will be persecuted on the basis of his resistance to "gang initiation on general principles and religious grounds." Pet. Br. at 43–44. Further, he claims that "gangs have attributed an opinion to him that he is supportive of rival gangs." Pet. Br. at 44. Finally, Escamilla argues that gangs may initially target recruits for violence in order to coerce them to join, but that, when met with refusal, the gangs target those who refuse on the basis of their opinion of the gang. In contrast to Escamilla's contentions, the record reveals that the gangs generally harassed Escamilla in an effort to get him to join. His interactions with the gang do not appear to be based on any political opinion he held. The IJ concluded that "the gangs attempted to recruit individuals to fill their ranks and not to target them for a belief or opinion that they held." CAR at 206.[6] The evidence in the record does not compel a contrary conclusion. Hang Kannha Yuk, 355 F.3d at 1233.

### E. CAT protection

Protection under the CAT requires Escamilla to show "that it is more likely than

---

[6] The BIA did not explicitly discuss the political opinion argument, instead agreeing with the IJ's broad finding that "the harmful circumstances that the respondent endured in the past and fears he will again suffer in the future in El Salvador at the hands of the Mara 18 and MS-13 gangs were not on account of a cognizable particular social group or ground enumerated in the definition of 'refugee.'" Thus, we turn to the IJ opinion for a "more complete explanation of those same grounds." Uanreroro, 443 F.3d at 1204.

25

not that" 1) he would be tortured if removed to the proposed country of removal, and 2) that the torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1) (2011). CAT protection does not require that Escamilla be tortured on the basis of a statutorily protected ground (i.e. because of his political opinion or membership in a particular social group). Cruz-Funez, 406 F.3d at 1192.

In the present case, Escamilla argues that he would be tortured by gangs and on account of his HIV-positive status. The analysis by the IJ and the BIA in this case summarily assumes that Escamilla might be tortured and focuses instead on the question of whether the government would acquiesce in any torture that might occur.[7] The BIA concluded that "[t]he record supports the Immigration Judge's finding that the Salvadoran government will not acquiesce in any torture perpetrated by criminal gangs." CAR at 4. The IJ's decision provides a more complete explanation with respect to torture by gangs. In considering the potential gang torture, the IJ relied on the BIA's holding in Matter of S-E-G- that "the government had difficulty controlling gangs in total in El Salvador, but had certainly not acquiesced to torture by gang members." CAR at 205. Because the

---

[7] In rejecting Escamilla's CAT effort to avoid deportation, the IJ found that Escamilla's evidence did not show the Salvadoran government had the specific intent to inflict torture. Id. at 206–07. This is an impermissibly high standard; the government need only acquiesce to the torture, not have any specific intent to inflict it. The BIA corrected this error on the appeal, noting that "[t]he respondent did not establish that the Salvadoran government would torture or acquiesce to the torture of the respondent for any reason," and that "respondent did not suffer any past torture during his encounters with gangs." Id. at 3–4.

government had not acquiesced, the violence by the gangs against the S-E-G- petitioner did not meet the definition of torture under the CAT.

The same is true in this case. The government of El Salvador does not acquiesce in gang violence. The record supports this conclusion. While Escamilla did allege that people wearing police uniforms were sometimes involved with the gangs when they attacked him, he was not sure that the people wearing the uniforms were actually police officers. Escamilla was shot once by police officers who were not involved in gang activity, but the officers who shot him mistook Escamilla for someone else. Such a mistaken-identity shooting does not rise to the level of torture on behalf of the government. The national government in El Salvador has made reduction of gang activity a primary goal, and it is working to mitigate gang violence. While the government's track record in reducing gang violence is weak, we cannot say that the government has acquiesced in gang activity.

The BIA opinion on HIV-related torture does not require bolstering from the IJ opinion. The BIA held that "[t]he respondent did not show that the government will more likely than not instigate, consent or acquiesce to torture of the respondent on account of his HIV status." CAR at 4. This conclusion is supported by the record; El Salvador has laws against discrimination against HIV-positive individuals, although they are not broadly enforced. HIV carries a heavy social stigma in El Salvador, and the record reflects that this stigma sometimes results in violence against HIV-positive individuals, but the record does not indicate that the government acquiesces in this violence as a

27

general matter.  The BIA's conclusion is supported by "reasonable, substantial and probative evidence considering the record as a whole," and thus we do not disturb it. Elzour, 378 F.3d at 1150.

## III.

We deny Escamilla's petition for review.

Entered for the Court

Mary Beck Briscoe
Chief Judge