FILED
United States Court of Appeals
Tenth Circuit

June 12, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

AHMED KHAMIS BWIKA; EMMA
ONDEKO BWIKA; AHMED BILAL
BWIKA,

        Petitioners,

v.

ERIC H. HOLDER, JR.,
United States Attorney General,

        Respondent.

No. 12-9560
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Judge, **HOLLOWAY**, Senior Circuit Judge, and
**TYMKOVICH**, Circuit Judge.

---

Ahmed Khamis Bwika, his wife, Emma, and their adult son, Ahmed Bilal

Bwika, are natives and citizens of Kenya. They petition for review of a decision of

the Board of Immigration Appeals (BIA) that affirmed the decision of the

immigration judge (IJ) denying their applications for asylum, restriction on removal,

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

and protection under the United Nations Convention Against Torture (CAT).  We deny the petition for review.

## I.  Background

Ahmed Bilal Bwika was first admitted to the United States as a student in 1997, and was ultimately authorized to stay until November 30, 2006.  His parents were admitted as tourists on February 22, 2006, and were authorized to stay until August 21, 2006.  They all overstayed their visas.  On February 20, 2007, the elder Mr. Bwika filed an affirmative application for asylum, restriction on removal, and protection under the CAT, listing his wife and son as derivative beneficiaries on his asylum claim.[1]  The Department of Homeland Security initiated removal proceedings against all three family members.  They conceded removability, and Mr. Bwika's wife and son ultimately filed their own applications for relief.

The Bwikas have been married for well over thirty years.  The elder Mr. Bwika is a member of the Digo clan, one of the nine subgroups of the Mijikenda tribe, who identify the small Coast Province region of eastern Kenya as their ancestral home.  Mr. Bwika grew up in the Coast Province.  He said that the Digo are Muslim, but generally retain traditional practices such as witchcraft, plural marriage, and intermarriage within families.  Admin. R. at 164, 177.  Mr. Bwika is Muslim (his father was an imam), but he does not practice witchcraft or plural marriage, and his

---

[1]  The Bwikas also have an adult daughter, who was living in Canada at the time of the agency proceedings.  Admin. R. at 158-59.

wife, Emma, is a Christian from the Luo tribe, who are from western Kenya. Most Kenyans outside of the Coast Province are Christian. *Id.* at 601.

For approximately twenty years, the Bwikas lived in Nairobi, the capital of Kenya, some distance from the Coast Province. Mr. Bwika worked as an aircraft engineer for the Kenyan Air Force and then for Kenya Airways, and Mrs. Bwika worked at a bank. Upon Mr. Bwika's retirement from his airline job in 1997, the Bwikas moved to Tiwi, a small town in the Kwale District of the Coast Province, in order to pursue Mr. Bwika's dream of owning an organic farm. He is related to many people there because of the Digo tribe's practice of marrying within the family. *Id.* at 177. But the Bwikas assert that they "stepped into a political situation that they were not fully aware of initially[:] the Digo's attempt to secede the Coast Province from the government of Kenya." Pet. Opening Br. at 32.

Mr. Bwika testified that between 1997 and 2003, a number of men approached him at various times about supporting their desire to attain federalism for the Coast Province through armed conflict. They lobbied him to become a militia trainer based on his past military experience, and asked him to become involved in politics. The chairman of the Kenyan African National Union political party explained to him "that our people don't have jobs. The up country [people] have come here and taken everything that is ours and we cannot get anything, so we have to [force] them out and take over everything." Admin. R. at 178-79. Mr. Bwika testified that he "underst[oo]d how [his] people [we]re being marginalized in their own land," *id.*

- 3 -

at 181, but he repeatedly refused all of these requests, telling all of these men that political diplomacy, not war, was the solution for the Coast Province. He said that that is when his problems began because he had become to them like the up-country people. His wife is a non-Digo and a Christian, and the militia training involved secret witchcraft rituals, which he learned about but did not practice, so he was "not part of them," *id.* at 200. He said that they considered him "expendable, an outsider." *Id.* at 202.

Mr. Bwika testified that attacks against him and his wife began in January 2001. In particular, one of several men who broke into their home one night to ransack it threatened to kill him with a machete. (His wife was hiding in the attic.) Mr. Bwika said that he believed that he would have been killed if the police had not arrived. He pressed charges against two of his cousins who were outside his house that night. One of them later went on trial, and Mr. Bwika saw that his neighbors and extended family were supporting the accused man instead of him. *Id.* at 196-97, 338. (The parties have not pointed to evidence showing whether or not the man was convicted.) Mr. Bwika also testified about other incidents of alleged persecution that occurred after the trial and that were connected to the January 2001 break-in, including attempts to pressure his wife to leave the Coast Province.

Mr. Bwika said that in 2003, he and his wife "had to run away secretly," *id.* at 208, to the nearby major city of Mombasa, where they stayed for the next three and a half years while employees managed their farm. They "got an apartment where

there was 24 hour security." *Id.* at 211. Mr. Bwika said that he encountered other Digo tribe members in Mombasa, and he believed that they sought to learn where he was living in order to kill him, but he and his wife were not harmed. They visited their farm for short periods, observing over time that the crops and the well had been poisoned, the livestock had died, and the farm buildings were slowly being destroyed. Their employees eventually said that they had to leave. The Bwikas finally decided that their persecutors would not give up looking for them, and they should leave Kenya. They believe that the Digo witchdoctors have power throughout Kenya.

## II. The Agency Decisions

The IJ denied the Bwikas relief in a forty-six page decision. The IJ expressly found that they were "not credible" because their testimony contained "internal inconsistencies" and because other evidence, including their expert's testimony, "contradict[ed] the perception and conclusion [they] presented" that they faced persecution from the Digo anywhere in Kenya on account of the elder Mr. Bwika's political opinion. *Id.* at 93. The IJ held that the Bwikas' troubles began with the January 2001 robbery, and that there was no "credible, relevant evidence which corroborate[s] that [t]his robbery was in anyway due to [Mr. Bwika's] political opinion," *id.* at 97, although the Bwikas might have believed otherwise, *see id.* at 99.

The IJ found that Mrs. Bwika may have suffered past persecution by her husband's family on account of religious and ethnic differences, but the incidents against her husband did not rise to the level of persecution, and there was no

- 5 -

evidence at all that their son was persecuted. *Id.* at 103-04. The IJ further found that Mrs. Bwika was not persecuted by the government of Kenya or a group the government was unwilling or unable to control because the evidence as a whole supported the view that the Digo are marginalized in Kenya, not powerful throughout Kenya. *Id.* at 94-95. The IJ concluded that the family could safely relocate within Kenya to avoid future persecution based on the evidence that they had lived for many years in Nairobi and Mombasa without suffering any persecution. *Id.* at 104-05.

Upon review, the BIA held that the Bwikas "did not meet their burden to prove with objective credible evidence that they are eligible for asylum, withholding of removal, or protection under the CAT." *Id.* at 7. The BIA affirmed the IJ's ruling in a separate decision, expressly incorporating the IJ's factual findings into its decision. *Id.* (The BIA disagreed with the IJ only that it was "inherently implausible" that Mrs. Bwika was able to avoid detection during the January 2001 break-in and robbery by hiding in the attic. *Id.* at 8 n.1.) The BIA held that the Bwikas "ha[d] not shown that the government of Kenya [wa]s unable or unwilling to protect him from the criminal acts of Digo tribe members or [Mr. Bwika's] family." *Id.* at 8. The BIA held that their alleged fear of future persecution in Kenya was undermined because the elder Mr. Bwika and his wife lived in Mombasa safely between 2003 and 2006 and in Nairobi safely for twenty years during their working years, because the elder Mr. Bwika voluntarily returned to Kenya after visits to the United States in 2001 and 2004, and because their son voluntarily returned to Kenya in 2003 and 2005. *Id.* at 9.

The BIA determined that the evidence of country conditions in Kenya conflicted with the Bwikas' claim that the Digo tribe was omnipotent over the Kenyan government. *Id.*

### III. Standards of Review, Issues on Appeal, and Discussion

> To be eligible for asylum, an alien must be a "refugee," meaning that he or she must be outside his or her country of nationality and "unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion."

*Elzour v. Ashcroft*, 378 F.3d 1143, 1148-49 (10th Cir. 2004) (ellipsis in original) (quoting 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)). "The showing required for [restriction on] removal is more stringent tha[n] the showing required for asylum." *Zhi Wei Pang v. Holder*, 665 F.3d 1226, 1233 (10th Cir. 2012).[2] To be eligible for restriction on removal, "an applicant must demonstrate that there is a clear probability of persecution because of his race, religion, nationality, membership in a particular social group, or political opinion." *Id.* (internal quotation marks omitted).

"[W]e have held that a finding of persecution requires the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive and must entail more than just restrictions or threats to life and liberty." *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004) (internal

---

[2]     "Restriction on removal was known as 'withholding of removal' prior to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996." *Elzour v. Ashcroft*, 378 F.3d 1143, 1148 n.5 (10th Cir. 2004).

quotation marks omitted). "Such persecution may be inflicted by the government itself, or by a non-governmental group that the government is unwilling or unable to control." *Id.* (internal quotation marks omitted). "Aliens basing their asylum claims upon a well-founded fear of future persecution must show both a genuine, subjective fear of persecution, and an objective basis by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear [of] . . . persecution." *Id.* (alteration and ellipsis in original) (internal quotation marks omitted). "[A] showing of past persecution[, however,] . . . gives rise to a rebuttable presumption of a well-founded fear of future persecution." *Rivera-Barrientos v. Holder*, 666 F.3d 641, 646 (10th Cir. 2012). But whether or not the applicant suffered past persecution, the claimed or presumed fear of future persecution may be rejected "if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . [and] if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(2)(ii); *see also Rivera-Barrientos*, 666 F.3d at 646 (if past persecution shown); *Ritonga v. Holder*, 633 F.3d 971, 977-78 (10th Cir. 2011) (where past persecution not shown).

"'[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006) (quoting 8 U.S.C. § 1252(b)(4)(B)). "We look to the record for substantial evidence supporting the agency's decision: [O]ur duty is to guarantee that factual determinations are supported by reasonable,

- 8 -

substantial and probative evidence considering the record as a whole." *Id.* (alteration in original) (internal quotation marks omitted).

The Bwikas argue that: (1) the BIA erred by affirming the IJ's adverse credibility determination because the IJ expressly found their testimony credible at the hearing, but then improperly relied on speculation and conjecture, ignored corroborating evidence that did not support his theory of the case, and misstated the evidence regarding country-wide persecution and lack of police protection; (2) the BIA misapplied the legal standard for persecution on account of political opinion; and (3) the BIA misapplied the legal standard for persecution on account of membership in a particular social group.

The Bwikas do not raise any argument with respect to their CAT claim in their opening brief, and we deem that issue waived on appeal. *See United States v. Bader*, 678 F.3d 858, 894 (10th Cir.), *cert. denied*, 133 S. Ct. 355 (2012). We also need not address the issues they have expressly raised because they have failed to adequately challenge the BIA's independently dispositive findings that they can relocate to another part of Kenya to avoid future persecution.[3] Even assuming that the Bwikas were credible, they admit that "[t]hey never had any problems the years that they lived in Nairobi and visited Tiwi for vacations." Pet. Opening Br. at 38. In addition, their own testimony substantially supports the BIA's finding that they suffered no

---

[3] The Bwikas' supplemental authority relates to the issues we need not address.

harm during the years they lived in Mombasa. The Bwikas have neither argued nor shown that any reasonable adjudicator would be compelled to conclude that the government of Kenya, throughout Kenya, is unwilling or unable to control Digo tribe members who might commit acts against them. The materials in the record show that the problems of violence connected to the Digo clan are in the Coast Province, not throughout Kenya, and the Bwikas admit that they "stepped into a political situation that they were not fully aware of" when they moved to the Coast Province. *Id.* at 32. As a result, we are not compelled to conclude that the Bwikas cannot safely relocate to another part of Kenya to avoid feared persecution.[4]

The petition for review is denied.

Entered for the Court


William J. Holloway, Jr.
Senior Circuit Judge

---

[4] It is immaterial that the BIA's truncated discussion does not explicitly mention relocation. The IJ made an express finding regarding the Bwikas' ability to relocate, and the BIA reaffirmed and augmented the reasoning upon which that finding was based. *See* Admin. R. at 9. Because the BIA also expressly incorporated the IJ's findings, we may look to the IJ's decision for additional substance for the BIA's decision. *See Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007).