FILED
United States Court of Appeals
Tenth Circuit

January 11, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MINTA DEL CARMEN RIVERA-
BARRIENTOS,

Petitioner,

v.

ERIC H. HOLDER, JR., UNITED
STATES ATTORNEY GENERAL,

Respondent.

----------------------------------------------

UNITED NATIONS HIGH
COMMISSIONER FOR REFUGEES,

Amicus Curiae.

No. 10-9527

---

**ORDER**

---

Before **TYMKOVICH**, **BRORBY**, and **MATHESON**, Circuit Judges.

---

Petitioner's petition for panel rehearing is granted in part for the limited

purpose of revising text in the first paragraph on page 10 in our original opinion

filed on September 7, 2011. Otherwise, the petition for rehearing is denied. A

copy of the revised opinion is attached to this order.

The petition for rehearing en banc was transmitted to all of the judges of

the court who are in regular and active service. No member of the panel and no

judge in regular active service on the court requested that the court be polled on rehearing en banc. The petition for en banc rehearing is denied.

The motion for leave to appear and file a brief as amicus curiae in support of petitioner's rehearing petition is granted.

Entered for the Court

*Elisabeth A. Shumaker*

Elisabeth A. Shumaker, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 11, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MINTA DEL CARMEN RIVERA-
BARRIENTOS,

        Petitioner,

    v.

ERIC H. HOLDER, JR., UNITED
STATES ATTORNEY GENERAL,

        Respondent.

----------------------------------------------

UNITED NATIONS HIGH
COMMISSIONER FOR REFUGEES,

        Amicus Curiae.

No. 10-9527

---

**ON PETITION FOR REVIEW OF AN ORDER OF**
**THE BOARD OF IMMIGRATION APPEALS**

---

J. Shawn Foster, Law Offices of J. Shawn Foster, LLC, Salt Lake City, Utah, for
Petitioner.

Michael C. Heyse (Mary Jane Candaux, Assistant Director, and Edward E.
Wiggers, Trial Attorney, with him on the brief) Office of Immigration Litigation,
Civil Division, United States Department of Justice, Washington, District of
Columbia, for Respondent.

Pamela Goldberg and Kaitlin Kalna Darwal, on brief for United Nations High
Commissioner for Refugees, Washington, District of Columbia, for Amicus
Curiae in support of Petitioner.

Before **TYMKOVICH**, **BRORBY**, and **MATHESON**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Minta del Carmen Rivera Barrientos suffered a brutal attack at the hands of gang members in her native country of El Salvador. She escaped to the United States and now seeks asylum. She contends she is eligible for asylum under 8 U.S.C. § 1158 because she has faced past persecution on account of her political opinion—opposition to gangs—and her membership in a particular social group—young females who have resisted gang recruitment. The BIA argues that the attack was not on account of her political opinion and that she is not a member of a cognizable social group. Because the BIA's interpretation of the applicable statute is not unreasonable, we conclude the agency did not abuse its discretion in finding that Rivera Barrientos was ineligible for asylum.

Exercising jurisdiction under 28 U.S.C. § 1252(a), we therefore AFFIRM the BIA's decision.

## I. Background

Rivera Barrientos is a native of a small town in El Salvador. While living there, she routinely witnessed acts of violence and crime committed by members of the Mara Salvatrucha street gang (MS-13).

-2-

In August 2005, members of MS-13 approached Rivera Barrientos and asked her to join the gang. She refused, stating, "No, I don't want to have anything to do with gangs. I do not believe in what you do." Agency R. at 879. They told her: "[i]f you don't want to join with us, if you don't participate with us, if you are against us, your family will pay." *Id.* Gang members continued to harass her and pressure her to join the gang over the next few months.

In January 2006, Rivera Barrientos came upon five gang members while walking alone to the bus station. They again demanded that she join the gang, and again she refused, stating that she disapproved of the gang's activities. One of them put a knife to her throat and they forced her into a car, blindfolded her, and drove her to a field. After dragging her out of the car, the gang members asked Rivera Barrientos if she had changed her mind, and she told them she had not. The gang members then began kissing her. When she struggled to escape, one of them smashed her in the face with a beer bottle. Three of the gang members then brutally raped her. Afterwards, they told her that she had to join the gang, and that if she talked to the police they would kill both her and her mother. Rivera Barrientos did not report the rape because she feared the gang members would follow through with their threats, and she did not believe the police could protect her.

Rivera Barrientos did not leave her house for several days after the attack. During this time, gang members appeared at her house on approximately five

occasions demanding to speak with her and repeating their intention to recruit her. *Id.* at 226. Rivera Barrientos's mother lied and told them she did not know where Rivera Barrientos was. Two weeks later, Rivera Barrientos's brothers sent her money, and she left El Salvador for Mexico by bus. She subsequently was apprehended by immigration officials while trying to illegally cross the border into the United States. Rivera Barrientos's mother reports that gang members have come back to the house looking for Rivera Barrientos multiple times since she left.

The Department of Homeland Security initiated removal proceedings against Rivera Barrientos for being an alien present in the United States without having been admitted or paroled, pursuant to 8 U.S.C. § 1182(a)(6)(A)(I). She conceded the charge of removability, but filed an application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT), based on her attack at the hands of MS-13 members.

After a hearing, the Immigration Judge (IJ) found Rivera Barrientos's testimony as to the events that took place in El Salvador was credible. Nonetheless, the IJ denied each of the claims and issued an order for removal. The IJ concluded, in relevant part, that Rivera Barrientos's claim for asylum lacked merit because she failed to establish past persecution on account of her political opinion or membership in a particular social group. On appeal, the BIA affirmed the IJ's decision.

## II.  Discussion

Rivera Barrientos appeals the denial of her claim for asylum.  She renews her claims that she was persecuted on account of her political opinion and her membership in a particular social group, and asserts that she is therefore a refugee eligible for asylum.

### A.  *Standard of Review*

"Our scope of review directly correlates to the form of the BIA decision." *Sidabutar v. Gonzales*, 503 F.3d 1116, 1123 (10th Cir. 2007).  Where, as here, "a single BIA member issues a brief order, affirming . . . the IJ's order . . . such an order constitutes the final order of removal . . . and thus this Court will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." *Id.*  When the BIA has failed to address a ground that appears to have substance, we should not reverse on that ground, but instead remand. *Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005); *see INS v. Ventura*, 537 U.S. 12, 16–17 (2002).

We review the BIA's findings of fact under a substantial-evidence standard. *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004).  Under this standard, "[t]he BIA's findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Hang Kannha Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004) (quotation omitted).

We review the BIA's legal conclusions de novo.  *Elzour*, 378 F.3d at 1150.

But the BIA's interpretations of ambiguous provisions in the Immigration and

Nationality Act (INA) are entitled to deference under *Chevron U.S.A., Inc. v.*

*Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  *Niang*, 422 F.3d at 1196

("The Supreme Court has instructed that the BIA should be accorded *Chevron*

deference as it gives ambiguous statutory terms concrete meaning through a

process of case-by-case adjudication.").

If the BIA's construction is reasonable, *Chevron* requires that we accept

this construction, "even if the agency's reading differs from what the court

believes is the best statutory interpretation."  *Nat'l Cable & Telecomms. Ass'n v.*

*Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  This standard of review is not

more searching where the agency's decision is a change from prior policy.  *FCC*

*v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009).  In making this

change, the agency need not make clear "why the original reasons for adopting

the displaced rule or policy are no longer dispositive" or "why the new rule

effectuates the statute as well as or better than the old rule."  *Id.* (quotations and

alterations omitted).

### B.  *Statutory Framework*

To be eligible for asylum, an alien must establish by the preponderance of

the evidence that he or she is a refugee.  8 C.F.R. § 1208.13.  The INA defines a

"refugee" as an alien unable or unwilling to return to the country of origin

*"because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."* 8 U.S.C. § 1101(a)(42)(A) (emphasis added).

An applicant may obtain refugee status in one of three ways. First, through evidence of a well-founded fear of future persecution. *Krastev v. INS*, 292 F.3d 1268, 1270 (10th Cir. 2002). Second, through a showing of past persecution, which gives rise to a rebuttable presumption of a well-founded fear of future persecution. *Id.* at 1270–71. And finally, through a showing of past persecution so severe as to provide a compelling argument against removal, even though there is no danger of future persecution on the basis of a protected ground. *Id.* at 1271.

Where, as here, the applicant pursues the second of these paths, a showing of three elements is required: "(1) an incident, or incidents, that rise to the level of persecution; (2) that is on account of one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either unable or unwilling to control." *Niang*, 422 F.3d at 1194–95. "For persecution to be 'on account of' [a statutorily protected ground], the victim's protected characteristic must be central to the persecutor's decision to act against the victim." *Id.* at 1200.

An alien who shows past persecution meeting these requirements is presumed to have a well-founded fear of future persecution, and is therefore eligible for asylum. But the government may rebut this presumption and prevent the grant of asylum if it shows the following by the preponderance of evidence:

(1) there has been a "fundamental change" in circumstances, such that the applicant no longer has a well-founded fear of persecution; or (2) the applicant could avoid future persecution by relocating to another part of the applicant's country. § 1208.13(1)(I).

### C. Persecution on Account of Political Opinion or Social Group

#### 1. Political Opinion

Rivera Barrientos first claims she was assaulted by MS-13 members on account of her political opinion. *See* § 1101(a)(42)(A). Specifically, she asserts the attack was retaliation for her political opposition to the gang's agenda, which she expressed to gang members by refusing to join the gang and condemning their practices.

The BIA disagreed, and found the attack was not on account of Rivera Barrientos's political opinion. "Although she expressed her anti-gang views to the gang members, the record does not support that these statements were one of the central reasons for their attack. Rather, the gang members attempted on several occasions to force her to join the gang and she was attacked due to her refusal." Agency R. at 4.

To show persecution on account of a political opinion, the applicant must establish the political opinion was "at least one central reason" for the persecution. § 1158(b)(1)(B)(I). The applicant's possession of a political opinion "cannot play a minor role in the alien's past mistreatment or fears of future

-8-

mistreatment. That is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Dallakoti v. Holder*, 619 F.3d 1264, 1268 (10th Cir. 2010) (quotation omitted).

The Supreme Court has clarified that a group's attempt to coercively recruit an individual is not necessarily persecution on account of political opinion. *INS v. Elias-Zacarias*, 502 U.S. 478, 481–83 (1992). In that case, addressing the petition of an applicant who feared he would be harmed or killed by guerillas upon returning to Guatemala because he refused to join their ranks, the Court explained that resistance to recruitment is not always an expression of a political opinion: "Even a person who supports a guerrilla movement might resist recruitment for a variety of reasons—fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention only a few." *Id.* at 482. But, the Court stated, even if it were clear that the applicant resisted on political grounds, he would need to make the additional showing that the guerillas would "persecute him *because of* that political opinion, rather than because of his refusal to fight with them." *Id.* at 483. So, too, must Rivera Barrientos show that her attack was motivated by more than anger at her unwillingness to join MS-13 and a desire to coerce her into joining.

Some evidence in the record supports Rivera Barrientos's claim that she was assaulted because of her vocal opposition to gangs. She testified that before the attack, she refused to join MS-13 and expressed anti-gang sentiments. The IJ

-9-

found this testimony credible. But even on this account of the events, the BIA did not err in concluding she was attacked primarily for her refusal to join the gang. The BIA's conclusion is supported by the fact that after the attack, the gang members again pressured Rivera Barrientos to join the gang and later visited her house repeatedly, stating their intention of recruiting her. Finally, the BIA decision is buttressed by a report stating that MS-13 has been known to use force and threats to coerce youths into joining the gang quite apart from any political or ideological point of view. Agency R. at 403 (INTERNATIONAL RIGHTS CLINIC, HARVARD LAW SCHOOL, NO PLACE TO HIDE: GANG, STATE, AND CLANDESTINE VIOLENCE IN EL SALVADOR (2007)).

In light of this evidence, we cannot say the BIA's finding must be reversed. Its conclusion that the central reason for the attack was Rivera Barrientos's resistance to recruitment and not her opposition to MS-13 is supported by substantial evidence.

### 2. *Membership in a Particular Social Group*

Rivera Barrientos's second contention raises a more difficult question and requires us to explore the evolving boundaries of social group membership. She contends she qualifies as a refugee because the attack was on account of her membership in a "particular social group." *See* § 1101(a)(42)(A). This group,

she argues, is made up of "women in El Salvador between the ages of 12 and 25[1] who resisted gang recruitment."[2]

The BIA denied this ground for relief, finding that Rivera Barrientos did not belong to a particular social group within the meaning of the statute. The BIA reached this conclusion after holding that young women who have refused to join gangs do not make up a group that is either "defined with particularity" or "socially visible." Agency R. at 3–4. And it also found the "central reason for the horrific attack ... was her refusal to join the gang, not her membership in a cognizable social group." *Id.* Rivera Barrientos challenges these findings on the

---

[1] This ground is not mooted on appeal, despite the fact that Rivera Barrientos is now older than 25. If she has been persecuted because she was a woman between the ages of 12 and 25 who resisted gang recruitment, she could now face future persecution for having held this status in the past. When an applicant has shown past persecution, there is a presumption of a well-founded fear of future persecution. § 208.13(b)(1). It is the government's burden to rebut this presumption with evidence that the danger of persecution has abated due to a change in circumstances. § 1208.13(1)(I). Because the government did not attempt to show that Rivera Barrientos's changed age would remove her from danger if she were repatriated to El Salvador, this change of circumstance is not relevant to our analysis.

[2] Rivera Barrientos identifies two additional traits of the putative social group. The first is political opposition to gangs. But because we have already upheld the BIA's finding that the attack was not on account of her opposition to gangs, we must also conclude it was not on account of her membership in a group defined by opposition to gangs. Rivera Barrientos raises the second, desire not to be subject to sexual slavery, for the first time on appeal. To the extent this is intended to be a different characteristic than having refused to join a gang, we do not consider it, because it was not properly raised before the Immigration Judge or the Board of Immigration Appeals. *See Tele-Commc'ns, Inc. v. C.I.R.*, 104 F.3d 1229, 1233 (10th Cir. 1997).

theory that particularity and social visibility are not required to show membership

in a particular social group. As *amicus curiae*, the United Nations High

Commissioner for Refugees (UNHCR) joins this argument. Rivera Barrientos

further contends that even if these are required elements, she satisfies them.[3]

Congress did not define the term "particular social group" in the INA, so

we defer to the BIA's interpretation unless it is unreasonable. *Gonzales v.*

*Thomas*, 547 U.S. 183 (2006); *Niang*, 422 F.3d at 1196. Over the years, the BIA

has attempted to provide an interpretation that is understandable and workable. In

*Matter of Acosta*, 19 I&N Dec. 211, 233 (BIA 1985), the BIA set forth a working

definition, interpreting the phrase to mean "a group of persons all of whom share

a common, immutable characteristic," such as "sex, color, or kinship ties, or in

some circumstances it might be a shared past experience such as former military

leadership or land ownership." The common characteristic "must be one that the

members of the group either cannot change or should not be required to change

because it is fundamental to their individual identities or consciences." *Id.*

The BIA in recent years has attempted to refine its interpretation. In

*Matter of C-A-*, 23 I&N Dec. 951, 957 (BIA 2006), the BIA held the

characteristics that define a "particular social group" must meet the additional

requirements of "particularity" and "social visibility." The BIA and the circuit

---

[3] At oral argument, Rivera Barrientos's counsel disclaimed any intent of proposing a social group composed of women between the ages of 12 and 25 without other identifying features.

courts have applied this holding to subsequent adjudications in a variety of requests for asylum, as we discuss in more detail below.

As a starting point in assessing the reasonableness of the BIA interpretation, we begin with the common meaning of "particular" and "group." Webster's defines "particular" as "an individual specific separate thing, instance, or case as distinguished from a whole class." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 1647 (2002). It describes "group," in turn, as "a number of individuals bound together by a community of interest, purpose, or function." *Id.* at 1004.

We also note the "particular social group" analysis is necessarily contextual, as the BIA "gives the [] statutory term[] concrete meaning through a process of case-by-case adjudication." *Niang*, 422 F.3d at 1196.

*a. Particularity*

The basic premise of particularity is that the proposed group "have particular and well-defined boundaries." *Matter of S-E-G-*, 24 I&N Dec. 579, 582 (BIA 2008). If the description of the proposed group is "too amorphous," and ideas of what the relevant terms mean are likely to vary, the applicant has failed to provide an "adequate benchmark for determining group membership." *Id.* at 584 (quotation omitted). "The essence of the 'particularity' requirement, therefore, is whether the proposed group can accurately be described in a manner

-13-

sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." *Id.*

The BIA has since applied this interpretation in a variety of contexts. For example, in *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 76 (BIA 2007), the BIA held the terms "wealth" and "affluence" are "simply too subjective, inchoate, and variable to provide the sole basis for membership in a particular social group." It explained

> Depending upon one's perspective, the wealthy may be limited to the very top echelon; but a more expansive view might include small business owners and others living a relatively comfortable existence in a generally impoverished country. Because the concept of wealth is so indeterminate, the proposed group could vary from as little as 1 percent to as much as 20 percent of the population, or more.

*Id.* Similarly, in *Matter of C-A-*, the BIA held a proposed group of "noncriminal informants" was too "loosely defined" to meet the requirement of particularity, as this definition "could potentially include persons who passed along information concerning any of the numerous guerrilla factions or narco-trafficking cartels currently active in Colombia to the Government or to a competing faction or cartel." 23 I. & N. Dec. at 957.

Rivera Barrientos, joined by the UNCHR, asserts the BIA's particularity requirement is not entitled to deference because it is an arbitrary attempt to limit the statutory "particular social group" basis for refugee status. But the particularity requirement flows quite naturally from the language of the statute,

-14-

which, of course, specifically refers to membership in a "*particular* social group."

§ 1101(a)(42)(A) (emphasis added).  It is the BIA's responsibility to give

meaning to all of the language of the statute, especially when there is some

ambiguity as to its scope and application.  And as a matter of logic, it is

reasonable to read the statute as limiting its recognition of "social groups" to

those that can be defined with some specificity—to encourage amorphous

definitions would likely yield inconsistent, arbitrary, and over broad results.

The UNHCR also raises a second point worth noting.  It contends the

particularity requirement is not consistent with the UNHCR Guidelines on

International Protection:  "Membership of a Particular Social Group," Within the

Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol

Relating to the Status of Refugees, U.N. Doc. HCR/GIP/02/02 (May 7, 2002).

The Guidelines offer a detailed interpretation of the term "particular social

group," as used by the United Nations Protocol Relating to the Status of

Refugees, Jan. 31, 1967, 606 U.N.T.S. 267, the treaty on which our statute is

based.[4]  *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999) ("[O]ne of

---

[4]    The Guidelines propose the following definition:  "[A] particular social group is a group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society.  The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights."  UNHCR Guidelines.

Congress' primary purposes in passing the Refugee Act was to implement the principles agreed to in the 1967 [Protocol]." (quotation omitted)).

It is true that the particularity requirement does not appear in the Guidelines interpretation. But while the Guidelines "may be a useful interpretative aid," the Supreme Court instructs us that "it is not binding on the Attorney General, the BIA, or United States courts." *Id.* Thus any variation from the Guidelines does not in itself establish that the BIA's interpretation is unreasonable. We therefore defer to the BIA's formulation of "particular social group" as requiring the group be defined with particularity.

In assessing particularity, the BIA's order does not provide a great deal of analysis, but generally relies on *Matter of S-E-G-*, a case holding that "Salvadoran youths who resist membership in the MS-13 gang [do not] constitute a group that is . . . defined with particularity." Agency R. at 3–4. There, the BIA found the proposed group of "[Salvadoran] male children who lack stable families and meaningful adult protection, who are from middle and low income classes, who live in the territories controlled by the MS-13 gang, and who refuse recruitment" lacks particularity, because "people's ideas of what those terms mean can vary," and the described group is "a potentially large and diffuse segment of society." *Matter of S-E-G-*, 24 I & N Dec. at 585.

*Matter of S-E-G-* does stand for the proposition that each of the individual traits listed is insufficiently particular. But while we agree the overall proposed

-16-

social group was broadly defined with ambiguous terms, the specific trait of having resisted recruitment is not so vague. A discrete class of young persons sharing the past experience of having resisted gang recruitment can be a particularly defined trait. More narrowly focused, this characteristic stands in notable contrast to the others listed in *Matter of S-E-G-*, such as lacking a "stable" family, or being "middle" class. Unlike these terms, the characteristics of gender and age are also susceptible to easy definition. For purposes of our analysis, therefore, we disagree with the BIA's conclusion that El Salvadoran women between the ages of 12 and 25 who have resisted gang recruitment do not make up a group that can be described with sufficient particularity to meet the standard for a "particular social group."

But even assuming that Rivera Barrientos satisfies the particularity requirement, we must go on to consider the BIA's second basis for finding Rivera Barrientos is not a member of a "particular social group"; namely that the group is not socially visible.

*b. Social Visibility*

Social visibility requires that "society perceive those with the characteristic in question as members of a social group." *Matter of C-A-*, 23 I&N Dec. at 957. "Whether a proposed group has a shared characteristic with the requisite 'social visibility' must be considered in the context of the country of concern and the persecution feared." *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. at 74. Although

"a social group cannot be defined exclusively by the fact that its members have been subjected to harm . . . this may be a relevant factor in considering the group's visibility in society." *Id.*

In applying this requirement, the BIA looks for two necessary conditions. The first is that citizens of the applicant's country would consider individuals with the pertinent trait to constitute a distinct social group. *See Matter of C-A-*, 23 I&N Dec. at 957 (dismissing one proposed social group in part because the applicant did not show that "members of society in general recognize a social group based on informants who act out of a sense of civic duty"); *Matter of E-A-G-*, 24 I&N Dec. 591, 594–95 (BIA 2008) ("There is no showing that membership in a larger body of persons resistant to gangs is of concern to anyone in Honduras, including the gangs themselves, or that individuals who are part of that body of persons are seen as a segment of the population in any meaningful respect.").

The BIA has sometimes addressed this question by inquiring whether individuals with the relevant characteristic have been targeted for persecution. Where it appears these individuals suffer no more negative attention than the general public, this suggests that the persecutors themselves, and likely society generally, do not perceive this portion of the population as set apart. For example, in *Matter of C-A-*, the BIA observed that the "drug cartels have directed harm against anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises. In this sense, informants are

-18-

not in a substantially different situation from anyone who has crossed the Cali cartel . . . ." 23 I&N Dec. at 960. Based on this fact, the BIA remarked "it is difficult to conclude that any 'group,' as actually perceived by the cartel, is much narrower than the general population of Colombia." *Id.* at 961; *see also Matter of S-E-G-*, 24 I&N Dec. at 586–87 (finding no societal perception of a group where the record did "not suggest that victims of gang recruitment are exposed to more violence or human rights violations than other segments of society").

The second, distinct component of social visibility is that the applicant's community is capable of identifying an individual as belonging to the group. Here, we consider whether "the shared characteristic of the group [is] generally [] recognizable by others in the community." *Matter of S-E-G-*, 24 I&N Dec. at 586. In *Matter of C-A-*, the BIA gave the following examples of groups defined by traits that are "highly visible and recognizable": Filipinos of mixed Filipino-Chinese ancestry; young women of a particular tribe who were opposed to female genital mutilation; persons listed by the government as having the status of a homosexual; former members of the national police; former military leaders; landowners; families. 23 I&N Dec. at 959–60. In contrast, confidential informants who gave information about the Cali drug cartel to the Colombian police are not socially visible because "the very nature of the conduct at issue is such that it is generally out of the public view." *Id.* at 960. The BIA explained that "recognizability or visibility is limited to those informants who are

-19-

discovered because they appear as witnesses or otherwise come to the attention of cartel members." *Id.*

Rivera Barrientos and the UNHCR challenge the social visibility test on several grounds. First, they contend the second prong of the test, the "recognizability" requirement, is unreasonable. They characterize this prong as requiring that "the common attribute be literally visible to the naked eye" or "easily identified by the general public," Amicus Br. at 13, and cite two Seventh Circuit cases for the proposition that such a requirement is "unexplained and illogical," Aplt. Reply Br. at 11.

In *Gatimi v. Holder*, 578 F.3d 611, 615–16 (7th Cir. 2009), the Seventh Circuit rejected the social visibility test after concluding the recognizability prong was inconsistent with a long line of unrepudiated cases finding a social group based on a physical trait that is generally "invisible," such as sexual orientation or female genital mutilation. The court argued the test

> makes no sense . . . . If you are a member of a group that has been targeted for . . . persecution, you will take pains to avoid being socially visible; and to the extent that the members of the target group are successful in remaining invisible, they will not be "seen" by other people in the society "as a segment of the population."

*Id.* at 615. The court went on to find that the petitioner, a defector from a Kenyan sect, was a member of a particular social group within the meaning of the statute. The Seventh Circuit reaffirmed this holding in *Ramos v. Holder*, 589 F.3d 426, 430 (7th Cir. 2009), based on its understanding that social visibility means "you

-20-

can be a member of a particular social group only if a complete stranger could identify you as a member if he encountered you in the street, because of your appearance, gait, speech pattern, behavior or other discernible characteristic."

If we agreed with the Seventh Circuit's understanding of the social visibility test, we might also find it problematic. But we see no need to interpret social visibility as demanding the relevant trait be visually or otherwise easily identified. The BIA decision adopting this test, *Matter of C-A-*, does not appear to contemplate such a narrow definition. There, for example, the BIA listed numerous attributes that are not easily recognizable to the public at large as examples of sufficiently visible traits. *Matter of C-A-*, 23 I&N Dec. at 959–60. If opposition to genital mutilation, kinship ties, and prior employment as a police officer are socially visible, social visibility cannot be read literally. Rather, social visibility requires that the relevant trait be potentially identifiable by members of the community, either because it is evident or because the information defining the characteristic is publically accessible.

In light of this understanding, we cannot find the BIA's recognizability requirement is either inconsistent or illogical. As the BIA asserted in *Matter of C-A-*, this requirement does not deviate from past precedent, since those populations the BIA has recognized as "particular social groups" meet the relatively undemanding standard of recognizability. And, in contrast to the stricter standard discussed by the Seventh Circuit, this requirement does not

exclude groups whose members might have some measure of success in hiding their status in an attempt to escape persecution.

The UNHCR also argues that the social visibility test is not entitled to deference because both prongs of the test are inconsistent with the UNHCR Guidelines. The UNHCR notes the BIA's social visibility requirement departs from the Guidelines in two material respects: first, under the Guidelines, an applicant may establish membership in a social group by showing the relevant trait is a fundamental characteristic, in accordance with the BIA's formulation in *Matter of Acosta*, *or* that society perceives a group to exist. The BIA, in contrast, requires that the applicant show a social group by identifying a fundamental characteristic *and* social visibility. And second, the requirement that the relevant trait be "recognizable" in some way is completely absent from the Guidelines.

No doubt the BIA's interpretation of the "particular social group" language diverges from that of the Guidelines. Once again, however, this alone is insufficient to show the BIA's reading is unreasonable. *Aguirre-Aguirre*, 526 U.S. at 427–28. We therefore join those circuits that have accepted the BIA's social visibility test in interpreting the statute. *See, e.g.*, *Scatambuli v. Holder*, 558 F.3d 53, 59 (1st Cir. 2009); *Davila-Mejia v. Mukasey*, 531 F.3d 624, 629 (8th Cir. 2008); *Ucelo-Gomez v. Mukasey*, 509 F.3d 70, 73 (2d Cir. 2007); *Arteaga v. Mukasey*, 511 F.3d 940, 945 (9th Cir. 2007); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1197 (11th Cir. 2006).

Rivera Barrientos also argues that, even if we apply the social visibility test, the BIA erred in finding her proposed social group does not meet this standard. We therefore consider whether the BIA erred in rejecting the view that women between the ages of 12 and 25 who have resisted gang recruitment are perceived to be a social group by Salvadoran society, and, if so, whether they are recognizable as such.

The BIA concluded that this question is controlled by *Matter of S-E-G-*, which held that individuals who have resisted gang recruitment do not make up a socially visible group in El Salvador. *See Matter of S-E-G-*, 24 I&N Dec. at 586–87. We agree. As was the case in *Matter of S-E-G-*, Rivera Barrientos has offered no evidence to suggest that Salvadoran society considers young women who have resisted gang recruitment to be a distinct social group.

Rivera Barrientos argues the pattern of persecution alone establishes that the gang perceived her as belonging to a specific group. She notes that she herself was targeted in the past by MS-13 for resisting recruitment, and she cites studies indicating that MS-13 frequently uses force against reluctant recruits. But, as the BIA observed in *Matter of C-A-*, we must distinguish between persecution based on social status, and an individualized reaction to the applicant based on her threat to the gang's interests. There, the BIA explained:

> Were a situation to develop in which former police officers were targeted for persecution because of the fact of having served as police officers, a former police officer could conceivably

demonstrate persecution based upon membership in a particular social group of former police officers. On the other hand, if a former police officer were singled out for reprisal, not because of his status as a former police officer, but because of his role in disrupting particular criminal activity, he would not be considered, without more, to have been targeted as a member of a particular social group.

*Matter of C-A-*, 23 I&N Dec. at 958–59; *see also Ucelo-Gomez*, 509 F.3d at 73 ("When the harm visited upon members of a group is attributable to the incentives presented to ordinary criminals rather than to persecution, the scales are tipped away from considering those people a 'particular social group' within the meaning of the INA.").

The evidence in the record suggests that gang violence is widespread in El Salvador, and that MS-13 directs harm against any individual where doing so may promote the gang's interests. We therefore agree with the BIA's finding in *Matter of S-E-G-* that individuals who resist recruitment are "not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests." 24 I&N Dec. at 587. The fact that Rivera-Barrientos was targeted thus does not provide evidence that society perceives her to be a member of a particular social group.

Because we agree with the BIA that Rivera Barrientos's proposed group fails the first prong of the social visibility test, we must conclude that it is not a "particular social group" within the meaning of the INA. We therefore affirm the

BIA's finding that Rivera Barrientos has failed to show that she was persecuted on account of membership in a particular social group.

## III. Conclusion

For the foregoing reasons, we AFFIRM the order of the BIA denying Rivera Barrientos's application for asylum.