FILED
United States Court of Appeals
Tenth Circuit

October 30, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

HECTOR ENOCH ARRAEZ BRANDY;
LUZDEILY ELIZABETH ARRAEZ;
ENOCH MOISES ARRAEZ CORREA,

      Petitioners,

v.

ERIC H. HOLDER, JR., United States
Attorney General,

      Respondent.

No. 13-9574
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

Petitioners are citizens and natives of Venezuela who seek review of a decision

of the Board of Immigration Appeals (BIA) dismissing their appeal from the decision

of the immigration judge (IJ) denying Hector Enoch Arraez's application for asylum,

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

withholding of removal, and relief under the Convention Against Torture (CAT). We exercise jurisdiction under 8 U.S.C. § 1252(a)(1) and deny the petition.

I.

Petitioners legally entered the United States in February 2011. Four months later, Mr. Arraez filed an asylum application. The other petitioners – who are his wife and son – are derivative applicants. The Department of Homeland Security charged the petitioners as removable and the matter was referred to the IJ.

Both Mr. Arraez and his wife testified at the merits hearing. Mr. Arraez said that he worked as a stock broker at Ban Express in Caracas where he sold government bonds to private clients and processed transactions. According to Mr. Arraez, in early May 2010 the late President Chavez "declared the stock market as traitors to the government." Admin. R. at 171. Chavez ordered the transfer of the investments held by the nation's stock brokerages (including Ban Express) to the Central Bank of Venezuela. Ban Express complied, and Mr. Arraez began helping the company with the government-ordered transfers. About the same time, four directors/managers from Mr. Arraez's office decided to leave Venezuela. One of these men, the operations manager, verbally told Mr. Arraez that he "needed to take care of the operations area." *Id*. at 186. There was no official announcement of Mr. Arraez's new duties, nor was he promoted or given a raise.

As Mr. Arraez was leaving the office one day in late May 2010, he was confronted by members of the national police. Mr. Arraez admitted that they could

not have known that he was in charge of the office. He was placed in a vehicle with four police officers and driven to police headquarters. During the trip, which took about two hours, a handcuffed Mr. Arraez was forced to kneel in an open area in the back seat with his head down. "[On] [s]everal occasions on the way [to the police station]," he testified, "I asked them why I was being arrested and they did not say a word to me." *Id*. at 158.

When Mr. Arraez arrived at the station, he was transferred to a vehicle known as "the cage." *Id*. During a two-hour trip to another police station, Mr. Arraez was forced to kneel on what was "a very rough surface." *Id*. The police held a gun at his head and called him and five other detainees "traitors of the government." *Id*. at 159. He "[a]ssume[d]" the other detainees were also stock brokers. *Id*. at 204. He spent several hours at the second station, during which time he was denied access to a restroom and the police threatened to "put us in jail without us being able to have a fair trial, because that was the orders given by President Chavez." *Id*. at 160. He was released the next morning with a warning not to file any kind of complaint at the risk of violence to him and his family.

Mr. Arraez returned to work for Ban Express until the end of June 2010, although he worked from home through the internet. After June, he worked for Ban Express as an independent contractor until he quit in the third week of November.

Mrs. Arraez testified that she worked for a government agency. The next work day after her husband's arrest, her boss confronted her to tell her that "she was

already aware of what [had] taken place with my husband, and she told me that she knew exactly who he was and who I was too. . . . [S]he told me that . . . I should just quit." *Id.* at 236. When Mrs. Arraez refused to resign, she was (1) forced to work longer hours; (2) expected to return a telephone call on the weekend; and (3) called names. She admitted that her coworkers suffered the same treatment and speculated that they were targeted for harassment because she was their manager.

In early November 2010, Mrs. Arraez wrote a letter to the agency's human resources department to complain of her treatment. The letter did not mention Mr. Arraez, his work as a stock broker, or the incident in May. Indeed, the letter did not give any reason for the alleged harassment. Mrs. Arraez testified that a few days later she received a threatening telephone call from an unknown person. The caller mentioned the letter and told her to quit or be killed. She resigned in mid-November.

Mr. Arraez testified that beginning in mid-January 2011 he received ten anonymous telephone calls. He answered four of them. Each time, the caller said that Mr. Arraez was a traitor and he would be killed. In late January he filed a complaint with the attorney general's office. According to Mr. Arraez, the report by the authorities did not mention his allegation that the calls had come from the police because they considered it speculation. Mr. Arraez and his family left Venezuela in early February.

The IJ rejected Mr. Arraez's applications. He denied asylum and withholding of removal because Mr. Arraez had failed to show past harm rising to the level of

persecution or a well-founded fear of future persecution. The IJ also denied relief under the CAT because there was no evidence that Mr. Arraez would be tortured upon his return to Venezuela. The IJ therefore ordered petitioners removed to Venezuela.

Petitioners appealed the IJ's decision to the BIA. In that forum Mr. Arraez argued that he had presented sufficient evidence to establish past persecution and that he had proved a well-founded fear of future persecution on the ground of a political opinion attributed to him by the Chavez regime. The BIA rejected Mr. Arraez's argument that he had been denied a fair hearing and affirmed the IJ's decision.

## II.

On appeal Mr. Arraez contends that he was entitled to asylum because he suffered past persecution and has a well-founded fear of future persecution on account of his membership in a particular social group or an imputed political opinion. He also argues that he was denied a fair hearing.

## A.

"To be eligible for asylum, an alien must show that [he] has suffered past persecution or has a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005) (brackets, footnote, and internal quotation marks omitted). Because a single member of the BIA affirmed the IJ's decision in a brief order, we review the BIA's decision, but "we are not

precluded from consulting the IJ's more complete explanation of those same grounds." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006). "Agency findings of fact are reviewed under the substantial evidence standard. . . . Under this standard of review, agency findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Ritonga v. Holder*, 633 F.3d 971, 974 (10th Cir. 2011) (citation and internal quotation marks omitted). "In this circuit, the determination whether an alien has demonstrated persecution is a question of fact." *Id*. (internal quotation marks omitted).

B.

"Persecution is the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive and must entail more than just restrictions or threats to life and liberty." *Tulengkey*, 425 F.3d at 1280 (internal quotation marks omitted). "We do not look at each incident in isolation, but instead consider them collectively, because the cumulative effects of multiple incidents may constitute persecution." *Ritonga*, 633 F.3d at 975.

The BIA found that the "harm in the form of [Mr. Arraez's] arrest and 10 hour detention, threats, and pressure on his wife such that she quit her job . . . do not rise to the level of past persecution." Admin. R. at 8. After reviewing the record, we conclude that this finding is supported by substantial evidence. While no doubt physically stressful and psychologically unsettling, the events did not rise to the level of persecution. *See Sidabutar v. Gonzales*, 503 F.3d 1116, 1124 (10th Cir. 2007)

(collecting cases with a finding of no past persecution). In light of our precedents, we cannot say that a reasonable adjudicator would be compelled to find that Mr. Arraez suffered past persecution. *See Ritonga*, 633 F.3d at 976.

C.

"Even without past persecution, [Mr. Arraez] could still qualify for asylum by establishing a well-founded fear of future persecution." *Tulengkey*, 425 F.3d at 1281 (internal quotation marks omitted). "Such a fear must be both subjectively genuine and objectively reasonable." *Id.* Relevant here, "[a]n asylum applicant has an objectively well-founded fear of persecution if . . . there is a pattern or practice in that country . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion, and the applicant belongs to and identifies with that group." *Id*. (brackets and internal quotation marks omitted).

As an initial matter, we will not consider Mr. Arraez's arguments regarding membership in a particular social group because he failed to raise this legal theory before the BIA. *See Garcia-Carbajal v. Holder*, 625 F.3d 1233, 1237 (10th Cir. 2010) (to satisfy 8 U.S.C. § 1252(d)(1), which requires an alien to exhaust his administrative remedies, "an alien must present the *same specific legal theory* to the BIA before he or she may advance it in court").

With regard to political opinion, Mr. Arraez argues that "[t]he Chavez government has imputed an anti-regime political opinion to former stock brokers and

others working in the stock market and has labeled them as traitors."  Pet'r Opening Br. at 26.  The BIA rejected this claim.  It agreed with the IJ's "finding that [Mr. Arraez's] subjective fear is not objectively reasonable because there was insufficient evidence that the government imputed or would impute a political opinion to lower level employees of stock brokerage companies or to [Mr. Arraez] specifically."  Admin. R. at 8.  The IJ's more complete explanation noted that "there is only subjective fear on the part of [Mr. Arraez] that would suggest any sort of retaliation.  There's no evidence . . . that those who return to Venezuela have been targeted, or persecuted, [or] put in jail, after they have visited another country and returned to Venezuela, merely because they were employees of a stock broker." *Id*. at 126.  Moreover, the evidence does not compel a finding of the necessary link between being a stockbroker and being perceived to have a particular political opinion.  *See Estrada-Escobar v. Ashcroft*, 376 F.3d 1042, 1047 (10th Cir. 2004) ("[T]he key is not the type of threat encountered, but whether the threat was encountered because of one's employment rather than because of one's political opinion.")

What Mr. Arraez is really asking this court to do is to reweigh the evidence and determine that he demonstrated an objectively reasonable fear of future persecution by drawing our own inferences from the evidence.  This we cannot do. "It is not our prerogative to reweigh the evidence, but only to decide if substantial

- 8 -

evidence supports the agency's decision." *Sidabutar*, 503 F.3d at 1125 (brackets and internal quotation marks omitted).

## D.

Mr. Arraez argues that he did not receive a fair hearing because there were factual errors in the IJ's oral decision and the IJ "was clearly confused [and] [s]uch [confusion] impacted [his] ability to make an accurate assessment of the evidence in the record." Pet'r Opening Br. at 11. "To prevail on a due process claim, an alien must establish not only error, but prejudice." *Alzainati v. Holder*, 568 F.3d 844, 851 (10th Cir. 2009). We agree with the BIA that Mr. Arraez received a fair hearing.

First, the facts misstated by the IJ were immaterial. Second, contrary to Mr. Arraez's argument that the IJ was confused and did not understand the testimony, the record tells a different story. When the IJ expressed confusion, it was a reasonable response to peculiar language or to an illogical or contradictory account of events. Also, we need not consider Mr. Arraez's argument that the IJ "made him use [an] interpreter and then [the IJ] did not understand the interpreter." Pet'r Opening Br. at 24. As the BIA explained, Mr. Arraez "did not object to the use of the interpreter, and he has not specified which words were specifically mistranslated or misunderstood after the interpreter was brought into the hearing." Admin. R. at 9. Mr. Arraez's due-process claim fails.

The petition for review is denied.

Entered for the Court


Harris L Hartz
Circuit Judge