**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 7, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

WILSON LEONARDO CANON
JIMENEZ; ANGELICA PARADA
DUARTE; D.F.C.P.; C.L.C.P.,

    Petitioners,

v.                                                                             No. 24-9573

PAMELA J. BONDI, United States
Attorney General,

    Respondent.
_____

**Petition for Review**
**from the Board of Immigration Appeals**
_____

Matthew K. Barringer, The Law Office of Matthew K. Barringer P.C., Greenwood
Village, Colorado, for Petitioners.

A. Ashley Arthur, Trial Attorney (Erica B. Miles, Assistant Director, with her on the
brief), Office of Immigration Litigation, Washington, D.C., for Respondent.
_____

Before **HARTZ**, **TYMKOVICH**, and **FEDERICO**, Circuit Judges.
_____

**TYMKOVICH**, Circuit Judge.
_____

Petitioners are natives and citizens of Colombia who filed applications for

asylum, withholding of removal, and protection under the Convention Against

Torture. The immigration judge denied their applications, and the Board of

Immigration Appeals affirmed.  Petitioners only appeal whether the BIA erred in denying their applications for asylum and withholding of removal.

Exercising jurisdiction under 8 U.S.C. § 1252, we **DENY** the petition for review.  Petitioners fail to demonstrate that they suffered persecution, that their alleged persecution had a nexus to a statutorily protected ground, or that the Colombian government is unwilling or unable to help them.  Nor does the record show that Petitioners cannot safely relocate within Colombia.

## I.    Background

### A.    Factual Background

Wilson Leonardo Canon Jimenez and his wife, Angelica Parada Duarte, and their two minor sons are from Bogota, Colombia.  The family owned and worked in a furniture factory in Bogota before relocating to the United States in December 2022.

Collectively, they have been members of the Colombian Liberal Party since 2012 and supported Federico Gutierrez, a candidate in the 2022 Colombian presidential election.  At the time, Petitioners went from door-to-door in local neighborhoods to seek favorable votes.  Beginning around the end of May 2022, Jimenez received threatening phone calls once or twice a week regarding his involvement in the Liberal Party.[1]  Other Liberal Party leaders and colleagues also received threats.  In early June 2022, a colleague was kidnapped and murdered,

---

[1] Jimenez used his personal phone number to publicly advertise his furniture factory.

2

despite reporting the threats he received.  Petitioners were undeterred and continued to campaign.

Jimenez has a provisional law license and was a law student in 2022 when the relevant events took place.  He also worked as an intern for the National Prosecutor's office in Colombia, helping victims of domestic abuse, extortion, and other crimes.  In his capacity as a provisional lawyer, a woman from San Bernardo requested his help with a property dispute in June 2022.  She explained that she had not received rent from the tenant occupying her property for over a year and asked Jimenez to speak with him about restitution and leaving the property.  Jimenez visited the property to negotiate an agreement, but was unsuccessful—the tenant told Jimenez not to "look for trouble" and refused to negotiate.  The client declined to proceed with a formal eviction process and instead hoped the tenant would surrender the property knowing that a lawyer was intervening.

Based on the title to the client's property, Jimenez learned that the tenant was, in fact, the client's ex-husband.  Although the ex-husband previously owned the property, it was transferred to the client as part of a divorce settlement.  Jimenez also discovered the tenant was Rafael Augusto Montanez Lancheros, also known as "Don Rafa," a leader of a group of narco-trafficking guerrillas politically aligned with the current president of Colombia, Gustavo Petro.

During his visit, Jimenez observed that the third floor of the property had been sealed off by the health department.  Jimenez investigated further and learned that the property was closed for being used as a day-rental for migrants and a base for

narco-trafficking and prostitution. The premises were also affiliated with reports of kidnapping and murder. Law enforcement had attempted several searches and seizures but those were seemingly unsuccessful. A local police officer told Jimenez to stay away from the property and to not seek problems.

Later that month, Jimenez received a threatening brochure at his factory that stated, "death to snitches from Liberal Party." Jimenez disregarded the threat and discarded the brochure. But the next month, while he was working at the furniture factory at night, two men held Jimenez at gunpoint and told him to leave the neighborhood. One of the men accused Jimenez of being a "snitch" for the prosecutor's office and considered him responsible for the searches and seizures at the property. After the men left, Jimenez and his wife locked the factory and thereafter closely monitored their children's commutes to school.

About two months after the death threat, the same two men revisited the furniture factory while Petitioners were out of town. They assaulted a factory employee and, taking out a gun, demanded to know where Petitioners were. The men again noted Petitioners were "snitches for the police" who were in politics. They threatened to kill Petitioners if they were seen again, noting that the order came from Don Rafa. The employee stated Petitioners were traveling and the men left without harming anyone else.

And days later, Jimenez witnessed a man put his arm around his younger son's shoulder as the son exited his school. The man put his hand over the son's mouth as the boy tried to escape, and told him to "run to your dad." Jimenez ran to his son and

4

pushed the man as the son dashed to Jimenez's car. The family moved to Jimenez's mother's home in the Bogota countryside for three weeks following the incident; there, they decided they would leave for the United States.

Before leaving, Jimenez told a police patrol officer what had happened. But the officer said nothing could be done and that police officers were contributing to the problem. The officer told Jimenez he and his family should leave. And that is what Petitioners did.

### B.    Procedural Background

Three months after Petitioners arrived in the United States without being admitted or paroled by an immigration officer, the Department of Homeland Security served Petitioners with individual Notices to Appear. The Notices charged each Petitioner as removable from the United States pursuant to the Immigration and Nationality Act.

In August 2023, Petitioners admitted the truth of the DHS's allegations. The IJ charged them as inadmissible and directed removal to Colombia. Petitioners applied for asylum and withholding of removal with the minor children proceeding as rider respondents and derivative beneficiaries of Jimenez's application for asylum.

Based on Jimenez's and Duarte's respective testimonies and other evidence in the record, the IJ denied Petitioners' applications. Although the IJ found Petitioners to be credible, the IJ concluded that Petitioners failed to establish: (1) their harm amounted to past persecution; (2) a nexus to a statutorily protected ground; (3) internal relocation was not reasonably available; and (4) the Colombian

government is unable or unwilling to protect them from their persecutors.  The IJ also denied Petitioners' requests for protection under the CAT.  Petitioners appealed, but the BIA affirmed and dismissed the appeal.  The BIA also rejected Petitioners' due process arguments that the IJ violated their right to counsel.

The full procedural history, now spanning approximately three years with this appeal, is visually depicted below:



## II.    Discussion

Petitioners appeal the BIA's decision denying their applications for asylum and withholding of removal.  They argue that the BIA erred by finding that they did not establish: (1) past persecution; (2) past persecution on account of their political opinion; and (3) a well-founded fear of future persecution that the government is unable or unwilling to protect them.  They do not appeal the denial of protection under the CAT or their due process claim.

### A.    Standard of Review

"We generally have jurisdiction to review final orders of removal, which can include a consolidated review of asylum claims." *Singh v. Bondi*, 130 F.4th 848, 859 (10th Cir. 2025) (citing 8 U.S.C. § 1252(a)(1), (b)(9)). "Our review of the Board's denial of asylum relief is limited to 'the administrative record on which the order of removal is based.'" *Id.* (quoting § 1252(b)(4)(A)). Because a single member of the BIA affirmed the IJ's decision, we review the BIA's decision, but "we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006).

"We review the BIA's findings of fact under a substantial-evidence standard. Under this standard, the BIA's findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary." *Rivera-Barrientos v. Holder*, 666 F.3d 641, 645 (10th Cir. 2012) (citation modified).

### B.    Legal Framework

"[A]sylum is a discretionary form of relief which may be granted by the Attorney General to eligible noncitizens." *Singh*, 130 F.4th at 857 (citation omitted). To be eligible for a discretionary grant of asylum, an applicant bears the burden of proving by a preponderance of the evidence that he is a refugee. *Id.*; 8 U.S.C. § 1158(b)(1). The INA defines refugee as:

> any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is *unable or unwilling* to avail himself or herself of the protection

7

> of, that country because of *persecution* or a well-founded fear
> of persecution *on account of* race, religion, nationality,
> *membership in a particular social group, or political opinion.*

*Niang v. Gonzales*, 422 F.3d 1187, 1194 (10th Cir. 2005) (emphases added) (quoting

§ 1101(a)(42)(A)).  One way an applicant may obtain refugee status is "through a

showing of past persecution, which gives rise to a rebuttable presumption of a

well-founded fear of future persecution."  *Rivera-Barrientos*, 666 F.3d at 646 (citation

omitted).  The applicant must prove three elements: "(1) an incident, or incidents, that

rise to the level of persecution; (2) that is on account of one of the statutorily protected

grounds; and (3) is committed by the government or forces the government is either

unable or unwilling to control."  *Id.* (quoting *Niang*, 422 F.3d at 1194–95).

### C.    *Past Persecution*

Petitioners allege that they suffered physical, psychological, and emotional

harm, in addition to the noted threats, that rise to the level of past persecution.

Persecution is undefined in the INA, but "we have held that a finding of

persecution requires the infliction of suffering or harm upon those who differ (in

race, religion, or political opinion) in a way regarded as offensive and *must entail*

*more than just restrictions or threats to life and liberty*."  *Wiransane v. Ashcroft*, 366

F.3d 889, 893 (10th Cir. 2004) (citation modified) (emphasis added).  "We do not

look at each incident in isolation, but instead consider them collectively, because the

cumulative effects of multiple incidents may constitute persecution."  *Ritonga v.*

*Holder*, 633 F.3d 971, 975 (10th Cir. 2011) (citation omitted).  "Whether a noncitizen

has proved past private persecution in their home country—the overarching issue

8

here—is a fact question." *Singh*, 130 F.4th at 859–60 (citing *Vicente-Elias v. Mukasey*, 532 F.3d 1086, 1091 (10th Cir. 2008)).

To begin, Petitioners assert that the multiple threats against them establish persecution. Although we consider threats in assessing the cumulative impact of the mistreatment Petitioners suffered, we have held that "threats alone are insufficient to constitute persecution." *Karki v. Holder*, 715 F.3d 792, 805 (10th Cir. 2013). Critically, Petitioners conceded at their merits hearing they were not physically harmed, and similarly noted in their opening brief that they experienced no lasting physical harm. Although physical harm is not necessary to satisfy the persecution prong, *id.* at 804, the suffered harm must be offensive and more than mere restrictions or sporadic threats, *Brandy v. Holder*, 590 F. App'x 744, 747 (10th Cir. 2014).

Petitioners urge us to also consider their lasting emotional and psychological harm. Duarte, for example, says she is unable to sleep or rest, and that her son started having panic attacks and stress. While Petitioners have endured unfortunate circumstances, such fears stemming from their received threats are insufficient to rise to the level of persecution. As physically stressful or psychologically unsettling some events may be, we have rarely, if ever, granted asylum based on threats and emotional or psychological harm alone.[2] *See id.* (finding an applicant's alleged

---

[2] As Petitioners' counsel conceded at oral argument, our case law has rejected asylum applications in cases involving more extreme fact patterns of inflicted harm. *See, e.g.*, *Chhetri v. Rosen*, 844 F. App'x 23, 27 (10th Cir. 2021) ("four telephone threats and one vague, in-person threat made to [petitioner's] father" did not

harm, including a 10-hour arrest and detention and threats, did not rise to the level of persecution, even though they were "physically stressful and psychologically unsettling").

Given these facts and circumstances, we find substantial evidence to support the BIA's finding that Petitioners' harm, even in the aggregate, does not amount to past persecution as defined in the INA.

## D.    *Nexus*

Next, Petitioners argue that the harm they suffered was on account of statutorily protected grounds—namely, their shared political opinion and particular social group.  Petitioners, however, did not brief any arguments regarding the existence of their particular social group[3] nor did they establish their membership in such a group.  Rather, in arguing the nexus requirement, Petitioners allege that they were persecuted by Don Rafa because of their political opinion.  Accordingly, we limit our review to whether Petitioners establish a nexus between their alleged persecution and their political opinion.  Specifically, Petitioners assert that they were harmed by Don Rafa and his associates because they worked on a campaign for a rival of the current president of Colombia.

---

constitute persecution); *Carias-Mejia v. Garland*, 860 F. App'x 121, 124 (10th Cir. 2021) (threats with machetes and being robbed six times was insufficient to constitute persecution because "the threats were contingent on compliance with a demand").

[3] Based on the record, the IJ determined Petitioners alleged the proposed social group of "social leaders."

"To show persecution on account of a political opinion, the applicant must establish the political opinion was 'at least one central reason' for the persecution." *Rivera-Barrientos*, 666 F.3d at 646 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). That is, Petitioners' political opinion "cannot be incidental, tangential, superficial, or subordinate to another reason for harm" or play "a minor role" in their past treatment or fears of future mistreatment. *Id.* (quoting *Dallakoti v. Holder*, 619 F.3d 1264, 1268 (10th Cir. 2010)). Of course, a persecutor can have multiple motives for targeting someone. *O.C.V. v. Bondi*, No. 23-9609, 2025 WL 2447603, at *6 (10th Cir. Aug. 26, 2025). Even so, in such mixed-motive cases, the persecutor must be motivated by at least one protected ground that is a *central* reason for the inflicted harm. *Id.* So here, Petitioners must demonstrate that their political opinion was or will be at least one central reason the persecutors targeted or will target them.

Petitioners fail to establish that requirement because there is substantial evidence supporting the BIA and IJ's findings that Petitioners were primarily targeted because Jimenez threatened Don Rafa's revenue and security, not because of their political opinion. Prior to Jimenez's run-in with Don Rafa, Petitioners were undeterred by threatening phone calls and a fellow campaigner's death, and continued their political activities. Petitioners do not point to any evidence in the record that suggests Don Rafa was behind those initial politically affiliated threats. In fact, Petitioners only began receiving escalated threats after Jimenez got involved in a property dispute with Don Rafa, and after Don Rafa became aware that Jimenez was investigating his rented property. During one of the threats, a man accused

11

Jimenez of working for the prosecutor's office and for being responsible for searches and seizures at Don Rafa's property. And when the same men later threatened Petitioners' employees, they stated Don Rafa had sent them.

Based on these facts, the BIA did not err in finding that the predominant motive behind the threats was due to Jimenez's professional and personal involvement with Don Rafa rather than Petitioners' political opinion. *Yuk v. Ashcroft*, 355 F.3d 1222, 1236 (10th Cir. 2004) ("[I]t is not our prerogative to reweigh the evidence, but only to decide if substantial evidence supports the IJ's [or the BIA's] decision.").

We agree that Petitioners' political opinion was merely tangential and subordinate to the main reason for harm.

### E.     *Government Protection*

Petitioners argue that even if they cannot establish past persecution,[4] they have a well-founded fear of future persecution, in part because the Colombian government is unable or unwilling to protect them. They assert that the persecutors are closely aligned and associated with the Colombian government, which prevents safe internal relocation.

The unable-or-unwilling analysis "considers evidence about a government's response to an applicant's past persecution." *Singh*, 130 F.4th at 861. "Two types of

---

[4] Having found Petitioners fail to demonstrate the nexus requirement, they do not meet the requirements for asylum. Relatedly, they are not entitled to a rebuttable presumption of a well-founded fear of future persecution. *See Chhetri*, 844 F. App'x at 26.

information weigh heavily when considering a government's response to persecution:
(1) whether the government stopped or tried to stop the persecutors . . . , and
(2) whether the government offered protection to the applicant, such as by placing the
applicant in protective custody." *Id.*

Intertwined in this analysis is an inquiry into whether the government had
notice of the alleged persecution and an opportunity to respond. *Id.* at 861–62.
"Without such notice, there is no way to know how the police would have reacted or
whether the government would have helped." *Id.* (citation modified). Accordingly,
"a key fact to the analysis is whether an applicant reported past persecution to the
government." *Id.* (citation omitted). While "a failure to report can undercut a claim
that the government was unable or unwilling to control the persecutors," it is not
necessarily fatal. *Id.* (quoting *Aviles-Gonzalez v. Garland*, No. 23-9547, 2024 WL
3066987, at *2 (10th Cir. June 20, 2024)). Indeed, the applicant may satisfy the
government protection requirement by demonstrating that filing a police report would
have been futile or dangerous. *Id.*

Again, there is substantial evidence in the record supporting the BIA's and IJ's
findings. Petitioners' efforts to reach out to the government for help were minimal, if
any. Jimenez and his father both worked or currently work for the government in
Colombia. Yet, neither of them reported wrongdoing or corruption. *See*
*Aviles-Gonzalez*, No. 23-9547, 2024 WL 3066987, at *2 ("Without such reporting,
we have no way of knowing how police would respond . . . ."). Petitioners testified
that they spoke to two individual police officers who said that Petitioners should not

13

seek trouble—but there is nothing to show that this reflects the Colombian government's position. *See Osorio-Morales v. Garland*, 72 F.4th 738, 743 (7th Cir. 2023) ("[W]e often require evidence of systemic, rather than individual, failures to prove that a government is 'unwilling or unable' to protect its people. Although police apathy can indicate a government's unwillingness or inability to protect an applicant, a one-off conversation with an unhelpful officer does not necessarily show that a government is 'unable or unwilling' to protect a victim." (internal citations omitted)). As the IJ found, the record does not show that Petitioners sought help outside their immediate neighborhood or through Jimenez's law enforcement contacts.

Petitioners seemingly argue that contacting the government for help would have been futile and dangerous because their persecutors are closely aligned and associated with the Colombian government. But that too is unsupported by the record. The government was aware of the property at issue and had attempted several searches and seizures to address the ongoing criminal conduct there. In other words, the evidence counters Petitioners' argument that their persecutors are closely aligned with the government and would be unwilling or unable to stop the persecutors. *See Singh*, 130 F.4th at 861. And Petitioners cannot show that the Colombian government was, or would be, unable or unwilling to protect Petitioners had it known about the threats they received. *See Chhetri*, 844 F. App'x at 27–28 (finding there was insufficient evidence that the government was unable or unwilling

to protect an applicant, particularly given the applicant declined to contact the police because he believed the persecutors were "part of the government").

Accordingly, we agree that Petitioners cannot establish a well-founded fear of future persecution for the purposes of asylum.

### F.    Safe Relocation

Although Petitioners have already failed to demonstrate the requirements for asylum, we briefly address their final argument regarding the feasibility and reasonability of safe relocation within Colombia.

The government may rebut an applicant's presumption of a well-founded fear of future persecution and prevent his asylum application if it shows by a preponderance of the evidence that: "(1) there has been a 'fundamental change' in circumstances, such that the applicant no longer has a well-founded fear of persecution; or (2) the applicant could avoid future persecution by relocating to another part of the applicant's country." *Rivera-Barrientos*, 666 F.3d at 646 (citing 8 C.F.R. § 1208.13(b)(1)(i)).

Petitioners have not demonstrated a fear of future persecution, but even if they had, the record supports the finding that they could reasonably relocate to another part of Colombia. Petitioners' family and relatives continue to live in Colombia unharmed, and Jimenez's father still works for the criminal justice system. Notably, Petitioners safely lived with Jimenez's mother in the Bogota countryside for three weeks before deciding to relocate to the United States. And recall that the men who

threatened Petitioners told them to move out of the neighborhood; they did not threaten the family to move out of the country.[5]

We therefore find Petitioners can mitigate any potential for future persecution by safely and reasonably relocating within Colombia.

## III.   Conclusion

In sum, there is substantial evidence supporting the BIA's findings that Petitioners do not qualify for asylum.  And because Petitioners fail to demonstrate a well-founded fear of persecution under asylum standards, they necessarily fail to meet the higher standard for withholding of removal.  *Carias-Mejia*, 860 F. App'x at 125 (citing *Uanreroro*, 443 F.3d at 1202).

For the foregoing reasons, we deny the petition for review.

---

[5] Petitioners maintain that relocating to a different part of the country is not feasible because "the presence of family in the home country does not always establish safety."  Pet'rs' Br. 18 (arguing those relatives may also have political opinions against the government).  But we cannot grant asylum based on such hypothetical hardships.  They also assert that relocation is unworkable because of administrative and economic burdens, and the country's judicial infrastructure, as well as the fact that their persecutors have ties to the president of Colombia.  But Petitioners only haphazardly brief those arguments and, given our findings above, their arguments do not pass muster.